## Case No. 7,014.

### The INDEPENDENCE.

[2 Curt. 350;[1] 3 Liv. Law Mag. 490; 18 Law Rep. 151.]

Circuit Court, D. Massachusetts. May Term, 1855.

CURTIS, Circuit Justice. The ship Independence, belonging to Boston, of the burden of 827 tons, sailed from that port on the 28th day of December, 1853, bound to Valparaiso, and while in Massachusetts Bay was struck by a violent gale of wind, which began about twelve o'clock of the night after the ship sailed. At three o'clock p. m. of Thursday, the 29th day of December, the master cut away the foremast, and let go the larboard anchor, and she brought up in ten fathoms of water. In about ten minutes, a sea struck her, which caused her to break adrift. She

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

continued to drift, but slowly, till seven o'clock, when the master cut away her main and mizzen masts, and let go the starboard anchor, and she brought up in about twenty fathoms of water. Her hull was uninjured. The place where she then lay was a bank, well known to fishermen and navigators, which lies north by west from Race Point, the extreme end of Cape Cod, and distant from five to eight miles therefrom. The Independence lay at anchor in that place until about twelve o'clock of the night of Sunday, the first day of January, 1854, when she was taken in tow by the steamer City of Boston, and brought to Boston, where she arrived between nine and ten o'clock on Monday, January the second. The master of the steamer, for himself, and the owners, officers, and crew of the steamer, entered his action for salvage in the district court; and the cause was removed into this court, by a certificate that the district judge is related to the libellant.

Three questions have been argued at the bar. First, whether this was in its nature a salvage service. Second, if so, whether it is to be compensated according to the ordinary principles which are applied by the marine law to such cases, or upon the footing of a quantum meruit for the work and labor. Third, what, upon either view which the court may adopt, is to be the amount of the compensation.

Most of the principles upon which the first two questions depend, were quite fully stated in the case of Hennessey v. The Versailles [Case No. 6,365]. I cannot doubt that the Independence was in a·condition to have a salvage service rendered to her. She was dismasted, lying helpless at her anchors, in the open sea, exposed to the winds and seas on every quarter except the south and southwest. The place was a bank, or shoal ground, and from the account given by her master of his drifting between three and seven o'clock, and the depth of the water when he let go his first anchor, and the increased depth where she was finally brought up, the latter place must have been near the outer edge of the bank. There was such depth of water around the bank, that there was very little probability of being able to hold on if she had drifted a short distance further to the eastward or southward. There was quite a strong current across the bank at each tide, so that, in point of fact, the chains were fouled while she lay there, and there was hazard of fouling her anchors at each turn of the tide in moderate weather, or upon a change of wind. And although the anchors if fouled, might be sighted and cleared, yet considering that it actually occupied about four hours to get one of the anchors, when the ship was taken in tow by the steamer, and that the other was slipped, and considering also that the ship was lying in such a place on the bank that she had very little ground to spare while sighting her

anchors, I think the liability to foul them a circumstance of some importance. At that season, very violent gales are not uncommon in that place, and a continuance of good weather is hardly to be anticipated. There was some danger, though I do not think it very great, of being run down in the night, especially if the weather should be thick. The fact that the master agreed to pay four hundred dollars to the master of a passing schooner, for an attempt to get a letter to Boston, advising the claimant of his condition, and that the claimant and some of the underwriters took such immediate and energetic, and manifestly, in any view, expensive measures, for the relief of the ship, leave no doubt that they considered her subject to considerably more than the ordinary dangers of the sea. Mr. Caleb Curtis, who was examined by the claimants as an experienced mariner and underwriter, though he says he does not think the ship was in much danger, also says that he thinks he should have been willing to insure her to the extent of $10,000 at five per cent.; a premium which must greatly exceed what he would have asked for an ordinary risk of such a vessel at and from Cape Cod to Boston.

To be in a condition to have a salvage service rendered, a vessel must be subject to something more than the ordinary perils of the sea; but a vessel in the condition I have described, is undoubtedly susceptible of having such a service rendered. Hennessey v. The Versailles [supra]; The Reward, 1 W. Rob. ·Adm. 174; The Princess Alice, 3 W. Rob. Adm. 138. There is a wide range between liability to ordinary perils, and a condition in which the perils are so great that unaided escape is impossible, or nearly so. I do not think this vessel was in either of these extreme cases. She was manifestly subject to marine perils, differing in kind and degree from the ordinary perils of navigation. To use an expression of Doctor Lushington, in a case somewhat like this, it was exceedingly expedient that she should be speedily relieved. But her condition, if not speedily relieved, was not by any means desperate; it was not improbable she might relieve herself, by clearing away the wreck of her masts, and getting up jurymasts, before she would strike adrift; and it was still more probable that she would receive effectual assistance from others. I view the case therefore as free from all doubt upon the first question, though I do not consider the peril of the loss of the property, which the steamer averted by its interposition, to have been of so marked a character, or the chance of relief therefrom by other means, to have been so small, that I can declare the service rendered, one of great magnitude.

Upon the second question, the answer pleads in substance, that Francis Bacon, who was president of the China Insurance Company, who were underwriters on the Independence and her cargo, applied to Mr.

Toby, one of the owners of the City of Boston, on Sunday morning. to hire that steamer to tow the Independence to Boston; that Toby replied he would ascertain if she was in a condition to go; that the claimant and Bacon met him at the steamer, and were informed by him that the vessel was in a condition to go, but he did not like to send her, though by her policies she had liberty to tow vessels, lest by going, she might vitiate the insurance on her cargo; whereupon, Bacon agreed for his company and the others interested, to insure her cargo while engaged in the service; and Toby, having expressed a doubt whether the steamer and her owners would not be held responsible for the non-delivery of her cargo on Monday morning, the claimant, personally, agreed to indemnify the owners of the steamer from such claims, and Toby expressed himself satisfied, and said the steamer might go; that thereupon Bacon inquired what amount he should charge for this service, and Toby replied, "I cannot name the sum, for I do not know how long she will be out, nor what she may have to do." To this Bacon rejoined. "Well, Mr. Toby, on the return of the steamship you shall send us your bill, and if we think it is too much, the sum we are to pay shall be left to disinterested parties;" to which Toby answered, "Well, I agree to that."

In support of these allegations in bar of the claim for salvage, the claimant has produced the depositions of Mr. Bacon and of John H. Pierson, who was present at the interview mentioned in the answer; a correspondence between the claimant and Mr. Toby has also been put into the case. I cannot attach much importance to this correspondence, post litem motam. Each party had their own views both of what had in fact taken place, and of the legal obligations which arose therefrom; and without questioning the sincerity or disposition to do justice, of either of them, it is the duty of the court to come to its own conclusions upon the pleadings and proofs, and to declare the law applicable thereto. Mr. Bacon being interested, as an underwriter on the vessel and cargo, his deposition is not admissible in evidence. Though the thirty-fourth section of the judiciary act (1 Stat. 92) has been held by the supreme court of the United States to adopt the state laws concerning evidence, that section is applicable only to the trials of civil cases at the common law. and the statute of Massachusetts, concerning interested witnesses, can have no effect upon the rules of the admiralty law, which exclude interested witnesses. except in certain cases where they are admitted ex necessitate. This testimony of Mr. Bacon is not within the exception, and it must be excluded. The remaining evidence is that of Mr. Pierson. He states that after the parties met at T wharf. "Mr. Bacon asked Mr. Toby if the steamer could

go down and tow up the ship Independence from where she was. There was some demur on the part of Mr. Toby, on account of the insurance of the cargo of the steamer and the steamer. Mr. Bacon said he would insure the cargo of that steamer and that vessel, so far that Mr. Toby was satisfied, and said, 'Let the vessel go.' Now I believe I can give you the very words. Mr. Bacon said, 'Mr. Toby, what will you let the steamer go for?' Mr. Toby said he could not name a price, or would not name a price, for he did not know the nature or extent of the service, or something implying that, at any rate; I think that was the very words. Shortly, a few moments after that, Mr. Bacon told Mr Toby he wished the boat should go down for the ship Independence, and as he could not name a price, when his bill was rendered for services, if it was too much, he would refer it to impartial persons. Mr. Toby said, 'Well.'"

Upon these allegations and proofs, I cannot hold that the claim for a salvage compensation, regulated by the principles of the marine law, is barred. It is incumbent on the claimant, in this case, to plead and prove. such a contract. as displaces the right to such a compensation. In my judgment, a contract, to be paid at all events, either a sum certain, or a reasonable sum. for work, labor, and the hire of a steamer or other vessel, in attempting to relieve a vessel in distress, without regard to the success or failure of the efforts thus procured, is inconsistent with a claim for salvage; and when such a contract has been fairly made, it must be held binding by a court of admiralty, and any claim for salvage disallowed. A salvage service is rendered when property is saved, which is in danger of being lost on the high seas, or when wrecked or stranded, on the shore of the sea (The Emulous [Case No. 4,480]; Bearse v. Three Hundred and Forty Pigs of Copper [Id. 1,193]; The Centurion [Id. 2,554]): but an unsuccessful attempt to save property thus exposed to danger, does not constitute a salvage service. or any service recognized by the maritime law as a subject of compensation. I agree also with Judge Ware, that the right of the salvor is merely a right to proceed against the thing saved to obtain his satisfaction. and not a personal claim on the owner, unless he has, by taking possession of the thing saved, thereby rendered himself personally liable for the reward. The Emblem [Id. 4,434]. And I do not understand that the nineteenth of the admiralty rules was intended to change this law. When, therefore, the subject-matter of a contract, is a mere attempt to save property, and when the owner, or his representative, or both, become personally liable by the contract, to pay either an agreed sum. or a quantum meruit for the labor and service rendered, without regard to its results, the parties do not contemplate. nor engage in, a salvage service, but

quite a different service. I know of no reason which forbids parties, competent to contract, from fairly contracting concerning such a subject-matter; nor do I perceive how a court of admiralty can, after the property has been saved, set aside such a contract, and declare that a salvage service was performed. In The William Lushington. 7 Notes Cas. Adm. & Ecc. 361, the learned judge of the English high court of admiralty declared, that an agreement cannot convert that which was originally a salvage service, into one of a different nature. This may be true; but I do not perceive, why an agreement may not be of such a character that, the service performed under it never was a salvage service, though rendered in saving property exposed to perils of the sea. Indeed, we know that such is often the effect of an agreement; as in case of mariners and others, who by reason of their contract, sustain such relations to the property in peril, that their interposition is not deemed voluntary, but the result of their previous contract. And if third persons have, by a valid contract, stipulated for work and labor and the use of a vessel, in attempting to save property in peril on the sea, and that for these, payment shall be made, whether any thing is saved or not, such a contract is inconsistent, in its nature and objects, and the liabilities which grow out of it, with a salvage service. As Lord Stowell declared in the case of The Mulgrave, 2 Hagg. Adm. 77, it is a case of contract and not one of salvage. I do not intend to be understood, however, that a case in which a contract exists, may not also be a case of salvage. The parties may agree on the amount of a salvage compensation, or on the principles upon which it shall be adjusted; and such agreements, fairly made, no advantage being taken of ignorance or distress, are readily upheld by the courts. The Emulous [supra]; Bearse v. Three Hundred and Forty Pigs of Copper [supra]; The A. D. Patchin [Case No. 87]; The True Blue, 2 W. Rob. Adm. 176; The Henry, 2 Eng. Law & Eq. 564,—are instances in which this has been done. Nor do I intend to express any opinion on the question whether the admiralty has jurisdiction in rem, to enforce a contract for services in assisting a vessel in distress, which are not salvage services. See the opinion of Judge Conklin, The A. D. Patchin [supra]. What I decide is, that to bar a claim for salvage where property in distress on the sea has been saved, it is necessary to plead and prove a binding contract to be paid at all events for the work, labors, and service, in attempting to save the property, whether the same should be lost or saved. This is a bar. But any thing short of this, affects merely the quantum of the compensation, not the nature of the service. And I have been careful to state the opinion I hold on this subject, because it seemed to me that the whole doctrine had not, so far as I know, been explained in any one case, and some misapprehension concerning it, seems to have existed in the minds of the very intelligent gentlemen interested in this case, though I presume not in the minds of their learned counsel.

Now it is manifest, that in this case there was no express contract to pay for the use of this steamer, at all events, nor that what was contracted for was merely an effort to find and tow up the Independence. It is strongly urged, however, that this is fairly to be implied from what took place. It is suggested, that if Mr. Toby had it in his mind during the interview between himself and Mr. Bacon and the claimant, that he should or might claim a salvage compensation, it was his duty to have apprized them of such intention. But, bearing in mind that the nature of the service on which he was requested to send his steamer was, prima facie, a salvage service, and that it is incumbent on those who would change its character by a contract, to make their intention to do so known, and have the assent of the other party, it seems to me the argument really applies to the claimant and Mr. Bacon; and that if they had in mind not to allow a salvage compensation in case of success, but to pay for work and labor at all events, for an attempt to assist the ship, it was their duty to have made their views distinctly known to Mr. Toby, and to have allowed him to judge, whether he would, or would not, send the steamer upon such terms. I do not mean to be understood as intimating that there was any intentional suppression by either of those gentlemen, of any thing which was then thought to be material. I do not think there was. But if there was any failure, from any cause, to make the necessary stipulations, the consequences of that failure must rest on the party who needs their protection. It is true, that if the claimant and Mr. Bacon had gone far enough, clearly to apprize Mr. Toby that they did not wish to engage his steamer in a salvage service, but did desire to have the steamer make an effort to find and tow up the ship, and that for the work and labor performed, a quantum meruit would be paid at all events, whether the ship should be found or not, and whether the steamer should be able to do the work or not, and Mr. Toby, after understanding these views, had sent the steamer, without more, this would have amounted to such a contract as would have barred the claim for a salvage compensation to be adjusted according to the principles of the maritime law. But the evidence does not satisfy my mind that such were the facts. Nothing was said, by either party, concerning salvage compensation, and of course there was no direct explicit notice given to Mr. Toby, that the claimant intended to exclude the idea of such a compensation. Nor was what was said, in my

apprehension, inconsistent with such a compensation. Mr. Toby was requested to let the steamer "go down and tow up the Independence, from where she was." He assented. He was asked, "What will you let the steamer go for?" He replied, "He could not, or would not name a price, for he did not know the nature or extent of the service." Certainly, so far from assenting to a contract which should fix the character of the service, and change it from salvage to mere work and labor, he refused to contract at all, because he was ignorant of the nature and extent of the service desired. All he assented to was, that the steamer should go upon an enterprise which, prima facie, was a salvage enterprise. Some reliance was placed on the fact that, when Mr. Bacon finally requested to have the steamer sent, he told Mr. Toby that "when his bill was rendered for services, if it was too much, he would refer it to impartial persons." and Mr. Toby said "Well." But with the exception of the use of the word "bill," there is nothing in this even, apparently inconsistent with its being a salvage service and to be paid for as such; and to allow any considerable weight to the use of the word "bill," in a conversation between two merchants, and say that because it does not technically describe a claim for salvage, therefore none was intended, does not seem to me admissible. Some reliance was also placed upon the fact that Mr. Toby saw the letter, which Captain Baker took to the master of the Independence. Excluding Mr. Bacon's deposition, as I am obliged to do, I do not find evidence that Mr. Toby saw this letter; and if he had seen it, any inference which might be drawn from it concerning the intentions of the parties would be too remote to affect my judgment. Upon this part of the case I am obliged to come to the same conclusion as in the case of Hennessey v. The Versailles [Case No. 6,365]; and though I think it highly probable that Mr. Bacon and the claimant did not expect to pay an ordinary salvage compensation for the service, yet upon the proofs, I must declare that they failed to make a contract which can displace the claim for such a compensation.

The remaining question is, what amount of compensation is proper in this case? The steamer was one of a regular line, plying between Boston and Philadelphia. and had arrived in Boston on the Sunday morning, when applied for to go to the assistance of the ship. She was of the burden of 558 tons, and her officers and crew, all told, numbered twenty-three. There was on board. cargo belonging to different consignees, of the value of forty-three thousand dollars. The steamer was of the value of forty-one thousand dollars. There was not time to land her cargo, and it was put at risk in the enterprise. Mr. Bacon undertook, in behalf of the China Insurance Company and the other companies interested as under-writers on the Independence and her cargo, to indemnify the owners of the steamer against the risk of the cargo of the steamer. It does not appear that Mr. Bacon had authority to enter into this contract, nor that either of these companies ratified his act; and though he bound himself personally, if without authority, yet, his personal liability was not what was stipulated for. It is pleaded, but not proved, that the claimant agreed to indemnify the owners of the steamer against all claims of consignees, on account of delay in the landing of their merchandise, occasioned by the departure of the steamer for the ship. In point of fact no such claims appear to have been made, but there was some risk that they might be made. The promptness with which the service was entered on, and the sufficiency of the skill with which it was conducted to a successful result, are not contested. The time employed was about twenty-four hours. The season of the year, and the appearance of the weather when the service was undertaken, are to be considered. For though the weather was not decidedly bad, and proved, in the event, to be as favorable as would ordinarily occur in that locality at that season, yet it was somewhat threatening, and the steamer was worked through a rather heavy head beat sea, from Boston light to the ship, under more than her usual head of steam. The towage was performed without damage to the steamer, and, as I think, without any dangerous exertion of her power. Except in the passage of a boat from the steamer to the ship, for the purpose of putting a pilot on board, there does not seem to have been any unusual risk of life. This passage was made in the night, in threatening weather, the sea being quite rough, and owing to the masts and rigging cumbering the lee side of the ship, it was necessary to board on the windward side. This service required skill. and involved some danger, but I do not consider it, in the actual circumstances. to have been great. The labor of the officers and men was not severe, and save that one of them was wet in the boat, there was no exposure beyond what is usual in night service. As respects the benefit received by the claimant, the ship and cargo were of the value of $201,000. Her condition, as I have already declared, was one of distress and exposure to unusual perils. but it was far from being desperate, if not succored. And there is sufficient reason to believe that the necessary assistance could and would have been obtained, in season to relieve her. if this steamer had not gone to her aid. The steamer was insured by time policies, with permission to tow and assist vessels in all situations, so that she remained covered during this enterprise.

It appears that while the ship was lying at anchor. about six o'clock on Saturday evening, the steamer, bound inward, hailed her,

the master of the steamer went on board, and inquired if assistance was wanted. The master of the Independence informed him he did need assistance and inquired for what price the ship could be towed to Boston. The reply was that he had not authority to make any bargain; and the master of the Independence, saying he had sent to Boston by a schooner and expected the R. B. Forbes, steamer, down in the morning. declined to receive assistance without a price being fixed, and thereupon the steamer went on her way. It was urged, that this conduct of the master of the schooner deserves the reproof of the court and detracts from his merit as a salvor. If there had been any immediate and pressing danger to life, on board the Independence, it might be difficult to justify either the refusal to render or to receive effectual assistance, by reason of pecuniary claims asserted or denied. But, setting aside such danger, I am not able to perceive how I can attach blame, either to the master or owners of the steamer, by reason of these occurrences.

The marine law has, for sound reasons, determined that a salvage service is to be paid for as such, and upon principles of compensation more liberal, than those applied to work and labor of a different character. These rules are established, not for the benefit of individuals who may perform salvage services, but for the general advantage of all interested in property exposed to the perils of the sea, either as owners or underwriters. Their object is to hold out to those able to make extraordinary exertions to save property thus exposed, sufficient inducement to cause them to make the attempt. And while administering this system of law, I cannot attach blame either to owners, for failing to give their masters authority to waive the benefit of these principles, or to masters for refusing to waive that benefit. The master of the vessel in distress may, generally, acting on his own responsibility to all concerned, refuse assistance, to be paid for by way of indefinite salvage compensation; and if a bargain is made, a court of admiralty will take care, that advantage be not taken of distress to impose unreasonable terms; but one who is under no obligation to interpose for the preservation of property, cannot be treated by a court of admiralty as insisting on what is improper, if he claims only what the marine law, for the general good, has deemed it fit and proper he should have.

Upon the elements above indicated I am to say what is the proper salvage compensation in this case. I consider the proper sum to be seven thousand five hundred dollars, and the claimant will be decreed to pay that sum into court for the salvors. The libellants may agree on the distribution among themselves, if they can; but their agreement must be reported to the court and sanctioned by its decree. This practice is necessary, generally, for the protection of the rights of the crew, and it is not to be departed from in this case.