## THE T. F. OAKES.

RAFTERY *et al. v.* THE T. F. OAKES, (REED, Claimant.)

*(Circuit Court, D. Oregon. October 18, 1888.)*

1. SEAMEN—DISCHARGE—BY CONSULAR OFFICER.
   A consular officer of the United States may discharge a seaman, on the application of the master, for any cause sanctioned by the usages and principles of maritime law, as recognized in the United States, on the payment of the wages then earned; and all claim for wages for the remainder of the voyage is thereby cut off and barred.

2. SAME—SHIRKING DUTY—INSOLENCE.
   A premeditated and persistent shirking and slighting of duty, or a deliberate and continued attitude of insolence and defiance by a seaman, is a sufficient cause for discharge, particularly when it appears that the seaman thereby intends to coerce or constrain the master in the discharge of his duty.

3. SAME—EVIDENCE—CONSULAR CERTIFICATE.

A consular certificate of the discharge of a seaman on the application of the master is only *prima facie* evidence of the material facts stated therein; and in a suit for wages for the unperformed part of the voyage by the discharged seaman, it may be shown that such discharge was illegal, or without sufficient cause.

(*Syllabus by the Court.*)

In Admiralty.   Libel for wages.
*John H. Woodward*, for libelants.
*Edward N. Deady*, for claimant.

DEADY, J.   This suit is brought by the libelants, John Raftery and Jorgen Olsen, against the ship T. F. Oakes, to recover the sum of $150.65 each, alleged to be due them as wages for services, as seamen thereon.

It is alleged in the libel that on May 25, 1888, the libelants shipped on the Oakes, then lying at the port of San Francisco, for a voyage from there to Nanaimo, B. C., thence to Acapulco, and thence to a port of discharge on the west coast of the United States, the voyage not to exceed six months; that on said day the libelants agreed with the master of the Oakes, Edward W. Reed, to serve as able-bodied seamen on said voyage at the wages of $40 a month, and signed articles to that effect; that the libelants performed their agreement, as seamen on board said vessel, until it arrived at Acapulco, when and where the master put the libelants ashore, without just cause, and without the payment of their wages; that the Oakes arrived at Portland on September 17, 1888, when and where she completed her voyage, and is now lying; and that, the premises considered, the libelants are each entitled to recover the sum of $150.65.

The answer of the master and claimant, E. W. Reed, admits the allegations of the libel, as to the voyage of the Oakes and the shipment of the libelants as seamen thereon, but denies that the libelants performed their agreement, or that they were discharged without just cause, or without the payment of wages, or that there is anything due either of them on account of the voyage.

It is also alleged in the answer that during all the voyage the libelants were insubordinate, and refused to obey the lawful commands of the officers of the vessel, and by persuasion and threats prevented the rest of the crew from doing their duty thereon; that on account of said insubordination and misconduct, the libelants were taken before R. W. Loughery, the United States consul at Acapulco, Mexico, where they were "discharged, and paid in full all wages due them," on "account of said insubordination and continued disobedience to the lawful commands of the officers of the vessel."

The shipping articles, in addition to the description and duration of the voyage, provide that the crew must "load and unload all cargoes if required,"—"bend and unbend sails, trim, coal, and dock the ship at her port of discharge, if required, or pay for the same being done;" and that "no dangerous weapons or grog allowed, and none to be brought on board by the crew," nor any "money advanced during the voyage."

The articles also contain the general stipulation in the form of the

agreement given in the table A of the schedule to the shipping act just following section 4612 of the Revised Statutes, to the effect that the "crew agree to conduct themselves in an orderly, faithful, honest and sober manner, and to be at all times diligent in their respective duties, and to be obedient to the lawful commands" of their superior officers, "whether on board, in boats, or on shore."

Attached to the articles is a certificate, dated August 11, 1888, given under the hand and seal of the United States consul at Acapulco, Mexico, R. W. Loughery, to the effect that the libelants on July 26th were duly discharged at that port from the ship T. F. Oakes of New York, "according to law," "for insubordination;" the master, C. W. Reed, "having deposited in this consulate" the sum of $82.66 as wages for each of them, and $80 extra wages.

It also appears from the testimony of the libelants that they are members of what is called "the Coast Seamen's Union of the Pacific Coast." A letter was found by the mate in the forecastle of the vessel at this port, dated "August 9, 1888," and addressed as follows: "John Raftery, and crew of T. F. Oakes—Dear Comrades." It purports to be written by one "H. Furwell" on paper with the title of this "Union," and the words, "Headquarters, San Francisco, Cal., 613½ East street," printed at the head of the sheet. It reads as follows:

"Your letter from Acapulco has come to hand, has been read in here in the office a dozen times, and has caused much merriment. It was thought here that he (the master of the Oakes) would try to get rid of you, and evidently he is trying pretty hard, but the policy which you have followed will make that just about impossible. With reference to weighing out the provisions for each man, Hutton says there *are* no law on the point, and no decisions either, and that the point is a delicate one, and had better not be touched; but one man should be present to see provisions weighed. About keeping up on afternoon watches, he says that Hoffman held that when work was necessary the men will have to do it, and further, that the men are not competent to judge whether it be necessary or not; so you, inasmuch as it will be a judge and not a jury's decision you would have in any suit for wages, it would not be safe to try. You have your *medicen* though, first in the coals and then at anything which comes along. You know as long as you pretend to work, as long as you make an effort, no matter how small, he can do nothing; as long as you work he can do nothing. If only twenty-five tons of coal get out per day you are doing as much as you can, you know; and that settles it.

"In taking in sails you may be an hour to do what could be done in five minutes. You may be 4 hours hoisting a top-sail, and he can do nothing; if his sails blow away you cannot help it, and so forth. You know pretty well how to do that, anyhow."

Then follows a page or so on the state of the sailor market in San Francisco, and the prospect for the winter.

A certificate under the hand and seal of the same consul at Acapulco, on August 15, 1888, addressed "To whom it may concern," was offered in evidence. It is to the effect that the Oakes arrived at that port on July 21st, with a crew reported by the master "as disposed to resist discipline and refuse duty;" that the libelants "were supposed to be the ringleaders, and after two or three days were discharged and paid off, believing that when they were removed there would be peace; on the

contrary, the next day nearly all the men refused duty," naming them. The master "was compelled to hire men from shore to unload the coal, of which there were 3,000 tons on board. The obdurate seamen refusing duty were sent to prison by me, and were kept confined by the captain of the port until the ship was ready for sea."

The libelants admit that soon after the arrival of the vessel at Acapulco they were taken before the consul at that port, and there discharged by the master, with the consent of the consul, for insubordination, and that the consul afterwards procured a passage for them on the steamer to San Francisco, and tendered them the balance of the wages deposited with him, which they refused to take.

By the general maritime law a master is authorized to discharge a seaman at either a foreign or domestic port for continued disobedience or insubordination, and such discharge terminates the relation of such seaman to the vessel and his right to compensation for the unperformed part of the voyage. *Hutchinson* v. *Coombs*, 1 Ware, 70; 2 Pars. Shipp. & Adm. 80.

By section 4580 of the Revised Statutes, as amended by the act of June 26, 1884, a consul is authorized to discharge a seaman on the application of the master, or that of the seaman. The causes for which he may discharge on the application of the seaman are specified, but not in the case of the application by the master. In either case, before a discharge is made, the consul must require of the master payment of the wages then due the seaman; but as I read the statute, the payment of extra wages is not required where a seaman is discharged for misconduct. Nor should it be. There is no ground on which such a seaman is entitled to any such consideration.

By section 1752 of the Revised Statutes the president is authorized to prescribe regulations concerning the duties of consular officers. In the book of "Consular Regulations," approved February 3, 1888, it is stated (section 178) that a master cannot lawfully discharge a seaman in a foreign port without the intervention of a consular officer, and that one of the usual cases in which a seaman may be discharged is his "misconduct." It is also provided therein (section 181:) "When a seaman is discharged in a foreign port, it is the duty of the consular officer to attach a certificate thereof to the crew-list and shipping articles," for which a form is given on page 573.

It appears, then, that the discharge of the libelants at Acapulco was in due form; and the only question is, was it done on sufficient cause, and what is the effect of it?

The causes for which a seaman may be discharged on the master's application not being specified in the statute, must needs be, in the language thereof, such as are sanctioned by "the principles or usages of maritime law, as recognized in the United States."

In my judgment a premeditated and persistent shirking and slighting of duty, as well as a deliberate and continued attitude of insolence and defiance to his superiors, on the part of a seaman, is such a cause; particularly where it appears that the seaman thereby intends to coerce or constrain the master in the discharge of his duty. Such conduct is in

effect disobedience and insubordination in its most injurious and provoking form.

The certificate of the consul is not conclusive evidence in this suit on that point, but it is *prima facie* evidence that the libelants were duly discharged for insubordination. In the case of the steamer *Uncle Sam,* 1 McAll. 77, it was held that the certificate of the consul to the discharge of the seaman does not preclude the court from inquiring into the cause of the discharge. But the certificate is made by a public officer, in pursuance of a statute, and is therefore *prima facie* evidence of the pertinent or material facts contained therein, as against the libelants. 1 Whart. Ev. §§ 640–643; *The Nith, ante,* 86.

And first, as to the letter from the secretary or agent of the "Coast Seaman's Union," H. Furwell. There is no doubt in my mind of its genuineness. The internal evidence is very satisfactory; and it is equally clear that it was written in reply to one from the libelant Raftery, as spokesman for the crew, from Acapulco, detailing the progress of the voyage, including the contest with the master for the rule of the vessel. But it is quite certain that the libelants never saw the letter, as they left Acapulco for San Francisco at the date of it. Under the circumstances, it is fair to presume that it was delivered to some of the "crew," to whom it was addressed, as well as Raftery. However, it betrays the *animus* and ideas of the "Union," of which these libelants are members and co-workers, and plainly discloses the illegal and dishonest practices and conduct to which a crew of that kind might and would resort, for the purpose of having their own way "on board ship," and getting along with as little work as possible.

The letter is material as showing the probable character of Raftery's to the "Union," to which it is a reply, as well as the probable state of mind and sense of duty, or want of it, in which the libelants went on board the Oakes. They already knew, as the letter states, how to idle along and consume a day in discharging 25 tons of coal instead of 250, to be an hour taking in sails that could be done in five minutes, to be four hours hoisting a top-sail, or let the sails blow away.

The oral evidence consists of the testimony of the libelants on their own behalf and that of the mate, who was also discharged, with his consent, at the same time they were; and the testimony of the master and second mate, now mate, for the claimant.

The libelants are young men. Raftery is entered in the articles as of New York, aged 27 years, and says he has been two and a half years on this coast. Olsen is entered as of Norway, aged 22 years. He says he has been five years at sea and two on this coast. He is apparently candid and outspoken, and, while claiming that he did his duty, substantially admits several instances of gross misconduct. Raftery is sullen and taciturn, and denies most of the instances of misconduct alleged against him in the testimony of the master and second mate.

The first mate appears to be a pleasant, plausible man, about 55 years of age, with considerable experience at sea. On his examination in chief he stated unqualifiedly that the crew was a good one, and did their duty well, and that there was much complaint of the food on the ship.

But on cross-examination he was forced to admit that the trouble about the food was not during the voyage, but only at Nanaimo, while the vessel was loading with coal, and that the material was sufficient in quantity and quality, but it was not well cooked; and also that he had made an entry in his log charging Olsen with misconduct and insolence to the master in the strait of Fuca, and signed one to the same effect, and more in the official log of the ship. My impression is that he is more concerned to support the case of the libelants than to tell the whole truth.

The treatment of the crew by the master and his officers was kind and considerate. The ship was well provided, and the voyage does not appear to have been a hard one. No complaint of any specific ill usage or injury is made by or for any one.

Raftery was in the habit of putting himself forward as spokesman for the crew or any member of it whenever an opportunity offered. He once said to the second mate, apparently in justification of such impertinence, that a "union" crew always had a leader, and he was the leader of that crew.

On one occasion, when the yards were being braced, the second mate said to the men handling the braces or ropes, "Run!" Raftery, who was next to the block, said, "No, don't run!" and the men didn't run.

On another occasion he refused to help serve out water because it was not yet 6 o'clock, as it was contrary to the coast rule to "turn to" before that time.

On the first day out from San Francisco, Olsen produced a loaded revolver, and discharged three barrels over the forecastle head. The master ordered him to give up the pistol, which he refused to do, until the articles were shown him, prohibiting the bringing of any "dangerous weapon" on board. His conduct in this matter was lawless and defiant. Presumably, the articles were read to him by the shipping commissioner when he signed them, and he brought the weapon on board, knowing he had no right to do so, and afterwards willfully discharged it in the face of the crew, apparently as a matter of bravado.

On coming out of the strait of Fuca, on the voyage from Nanaimo to Acapulco, Olsen was at the wheel, and steered so as to let the tug come broad on the bow of the vessel. The master called his attention to it. He answered, "All right," but did not change his wheel, as the master thought he should, when the latter said, "Put your wheel over," to which Olsen replied in an offensive manner, "I can steer as well as you can." Thereupon the master called another man to the wheel, who impudently said to him, "Olsen is as good a seaman as there is on the ship." On this the master called the crew aft, and said "he expected proper respect from them," which they all promised except Olsen, who said if the master did not treat them well they would make it cost him $100 a day when discharging cargo; that they could put out 50 tons or 500 a day, just as they liked.

A short way out from Acapulco, the vessel lost three sails in a squall at night, which the second mate thinks was largely attributable to the slowness and the indifference of the crew.

The Oakes arrived at Acapulco on July 21st, and commenced discharging her cargo of coals with the aid of steam-power, the tubs being filled in the hold by the crew. And here both Raftery and Olsen persistently shirked the labor at which they were set—of filling the tubs. Instead of filling a shovel with coal, and putting it directly in the tub, they would slowly get a half shovelful, and, lifting it up leisurely, turn around, and rest it on the edge of the tub while they looked about, and then dribble it into the tub. On one occasion the second mate, looking down the hatchway, and seeing Raftery "soldiering" with his shovel, asked him ironically and reproachfully, "Don't you want a spoon?" to which the latter impudently replied, "I don't care if I do."

Finally, on July 26th, the libelants were taken by the master before the consul at Acapulco, and, after an examination of the parties by that officer, they were discharged from the ship for insubordination, and paid off; the amount of the wages for two months and two days and one month's extra wages being paid to the consul for them, as the law and regulations require.

Afterwards, on August 9th, the consul furnished them a passage on the regular steamer to San Francisco, and I suppose paid their expenses while on shore, as the law also requires, and tendered them the balance of their wages, which they refused.

The certificate of the consul is *prima facie* evidence of the justice of the discharge. And although this court may in this suit go behind it, and, on a proper case, determine otherwise, yet the proof must be sufficient to overcome the *prima facie* case. The consul has the parties before him, face to face, while the matter is fresh in the minds of all parties, and the truth is most likely to come to the surface, and his action should not be lightly disregarded or set aside. I am satisfied that his action in the premises was just and proper.

I have taken more pains and time with this case than the intrinsic difficulty of it demands. My reason for so doing is that I am strongly impressed with the idea that the whole trouble grows out of the methods and purposes of the Seamen's Union of San Francisco. It appears to be organized for the purpose of controlling the conduct and employment of seamen on this coast, to the end that ships shall be navigated in the interest and at the pleasure of the forecastle, without any reference to the rights or interests of owners.

Acting on this anarchical idea, these libelants undertook to administer to the master the prescribed "medicine" for his refusal to submit to their dictation, by loitering and trifling over their work in discharging cargo at the expense of the ship.

But the law will not tolerate such conduct. The contract of the libelants bound them to be diligent and obedient in the discharge of their duties. They willfully and persistently violated this contract, and were properly discharged and paid off, getting even one month more wages than they were entitled to.

The decree of the court will be that the libel be dismissed, and that the claimant recover his cost.