## MATTES et al. v. STANDARD TRANSP. CO.

(District Court, S. D. New York. April 26, 1921.)

1. Seamen ⊙═26—Owner, being sued for wages of discharged seamen, must prove just grounds for discharge.

In libel in personam for wages of discharged seamen, the owner must prove just grounds for the discharge.

2. Seamen ⊙═26—Discharge of seamen for incompetency held a cover merely to avoid continued payment of American wages.

In libel in personam for seamen's wages against owner, which had discharged the seamen, claiming them to be incompetent, without procuring a certificate of consul approving such discharge, under Rev. St. §§ 4580, 4581 (Comp. St. §§ 8371, 8372), evidence *held* to prove that the discharge for incompetency was colorable, and merely a cover to avoid the continued payment of American wages.

⊙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Libel in personam by Victor Mattes and others against the Standard Transportation Company for seamen's wages. Interlocutory decree for plaintiffs for reference before a commissioner.

The respondent is a British corporation and at the time in question was the owner of the Wabasha, flying the British flag. She sailed from Bombay in the early part of 1920, and reached New York with a Chinese crew in April of that year. This crew deserted while in New York, and the master was forced to engage another crew, consisting of 45 or 47 men, of whom the libelants, 29 in number, were a part. They were made up of various nationalities, largely Portuguese, who were supplied by a boarding house keeper. The Wabasha was a coal-burning steamer, and the men shipped as seamen, firemen, quartermasters, oilers, and coal passers. Some of them had prior discharges, and all swore at this trial that they had had former experience as seamen.

The master, the chief officer, the second officer, the second engineer, and steward were called for the respondent, and swore that the crew was incompetent. The quartermasters could not steer a straight course; the cook so cooked the food that the crew were in constant complaint; the seamen were unable to do anything but the simplest duties. The second engineer testified that the coal passers refused to heave up the ashes, so that the firemen were unable to work the boilers, and the speed of the ship was reduced from 10½ to 8 or 9 knots an hour. The master swore that the men could not get the ashes out, and that one of them hurt his hand in doing so; that the officers constantly complained that there was no sailor among the crew; that they were themselves always complaining of their food; that off Gibraltar he threatened to call a British man-of-war, apparently because of their complaints about food. On his cross-examination, however, he testified that their conduct was not bad conduct, that they tried to obey orders, but were incompetent.

The steamer made the port of Algiers on May 10th, when the master called the crew on dock, and, according to his statement, asked them whether they would be willing to be sent back to New York. He says that they agreed, and the other officers say so. The crew, of whom many were called, unanimously swore that they performed their duties and were ordered off the ship, on which they were willing to serve out their articles. In any event, they went ashore in small boats, and the master on the 11th shipped an Algerian crew at £25 a head to Calcutta, with maintenance ashore and return to Algiers added. (The master said that they would not serve beyond Calcutta.) At that port this Algerian crew was sent back by passenger steamer and a Lascar crew shipped, at about 24 or 26 rupees a month, equal to $8 or less. This third crew worked the ship back to New York.

The libelants, together with the rest of the New York crew, were sent home via Havre, and their wages paid until June 8th, when they arrived. As the Wabasha reached New York on September 15th, they claim for loss of wages between those dates, less what each had been able to earn meanwhile.

Silas B. Axtell, of New York City, for libelants.
Courtland Palmer, of New York City, for respondent.

LEARNED HAND, District Judge (after stating the facts as above). It was apparently the early rule that mere incompetence would not justify a master in discharging a seaman at a foreign port. Capillo v. Bristol Packing Co. (D. C.) 112 Fed. 439; Sherwood v. McIntosh, Fed. Cas. 12,778 (semble). The master's powers were only to degrade the seaman to such services as he was capable of performing and upon eventual payment to deduct from his services whatever was the loss occasioned by his incompetence. In this respect the incompetence was put upon a different basis from insubordination or deliberate shirk-

ing of duty, The T. F. Oakes (C. C.) 36 Fed. 442, or drunkenness, The Bertha, 111 Fed. 550. I am not prepared to say, however, that incompetence may not be a sufficient ground for discharge even in a foreign port (Rev. St. § 4581 [Comp. St. § 8372]), at least where the master provides for the repatriation of the seaman, and especially, as here, where he pays wages until his arrival home. Although the master has some opportunity, upon shipping a crew, to ascertain their former experience by their discharge papers, they engage, nevertheless, as competent to perform the duties which they undertake, and it seems to me a harsh rule that would require a master to continue an incompetent crew, however subordinate and ready, providing he is willing himself to assure their return home. In any event, that case can await its arising, for it is not before me here.

[1, 2] The respondent must, however, prove just grounds for the discharge, and the whole circumstances of this case do not satisfy me that the excuse given by the master, though corroborated by his officers, was the true reason. It seems to me inherently unlikely that 45 men, many of whom certainly had had prior service, and all of whom say that they had, should turn out to be wholly incompetent, every man of them, for the comparatively simple duties which devolved upon them. The specifications of their incompetency are vague and contradictory. The engineer says that they refused to heave up the ashes; the master merely says that, though willing, they could not, something which it is very hard to believe. It is, of course, possible that the quartermaster could not steer a straight course, and that the oilers were not expert; but that did not involve the whole crew. No doubt there were complaints of food; there generally are, but such complaints could scarcely justify the threat to call a war vessel. The master expressly disclaims any insubordination, and their complaints must be put down to sailors' growls.

On their face, the charges bear an appearance of being trumped up, nor are they mended by the two letters written to the owners on May 8th, which may well have been to lay a foundation to his case. Again, I think it unlikely that the men were willing to go home, and thought they would have a "jolly holiday." Work proved scarce when they got here, and it is fair to assume that they knew it would be so. They swear that they had a good berth and there is no reason to doubt them, if the abundance of food, which the officers insist they gave, was in fact supplied. Moreover, why did he retain the two cooks, around whom much of the trouble centers? He says that they did not want to leave, but a more likely reason, I suspect, was that Arab cooking would be worse. Was there an adequate motive for wishing to be rid of them? I think there was.

The Wabasha had shipped a Chinese crew at Calcutta or Bombay, and these deserted in New York. Their desertion may be attributed to the recent laws, which enable them to ship here at higher wages, and the result was that intended; i. e., to compel the captain either to raise his wages to the American standard, $85 or $95, or to take on a new crew at those rates. Finding his hand so forced, it was obviously to his advantage, if he could, to get rid of this crew as soon as

possible. The alternatives open to him were three; he could discharge them, and ship them back at Algiers, as he did; he could take them to Calcutta and there discharge them; or he could carry them back to New York. If he discharged them at Algiers, he must get an Algerian crew to work the ship on to Calcutta, and these in turn could be discharged and sent back, and a Lascar crew substituted, with merely nominal wages.

There were, indeed, serious losses involved in discharging the American crew at Algiers and shipping an Algerian crew to Calcutta. The cost of shipping the American crew back was about $12,600, and the cost of the Algerian crew $13,000, making a total of over $25,000. The cost of the American crew between June 8th and September 15th was about $12,000, making a difference there of $13,600, which the ship lost. This, the respondent answers, is conclusive evidence against the master's putative motive. I think that this analysis of the situation is not complete. The master was under engagement to take the American crew back to New York; he would there have had to engage a second American crew, presumably at the same high wages. Had he carried them to Calcutta and discharged them, the expense would have been greater, and by discharging them at Algiers and employing an Algerian crew only to Calcutta, he had his ship free at that place, and could then begin with a Lascar crew for a round trip, which would end again in India.

Once he got his ship manned with cheap labor, he could continue to work her at Indian wages, and he would make up his loss in five months. If he did not, he was condemned indefinitely to pay American wages. True, in so doing he ran the risk that the Lascar crew in turn would desert at New York, just as the Chinese crew had done; but that depended upon his being able to keep his Lascars out of the hands of those who might advise them of their rights in New York. That risk, it appears to me, he might well have accepted. Moreover, it seems to me very strange that he could not get his Algerians to work the ship back from Calcutta to Algiers, but must hire them only for the voyage out. That is an unexplained and indeed surprising circumstance, which fits much better with the plan which I think he had in mind from the outset, to get his wage scale back upon the Indian level.

Thus, merely as between the officers' assertions, which are to me significantly vague, and the crew's denials, I should find it impossible to accept the excuse. There is, however, another circumstance which appears to me to put the case beyond any doubt. The master was in a port where there was a British consul, whose sanction he professes orally to have obtained to what he insists was a voluntary discharge. Now, section 188 of the British Merchant Shipping Act of 1894 provides that no master shall discharge a seaman without the "sanction" of the local consul indorsed on the articles, and the consul must examine into the causes of the discharge before he sanctions it. In cases of "leaving behind," he must issue a certificate stating the causes thereof, and, if the master violates this section, he commits a misdemeanor.

So it makes no difference whether this was a case of strict discharge or leaving behind; the master did not do what the law required of him, and was in any event guilty of a misdemeanor. It is hornbook law for masters that discharges must be approved by consuls, and the law of the United States is in substance the same. Rev. St. §§ 4580, 4581 (Comp. St. §§ 8371, 8372). That the master thus violated the law, and did not get the "sanction" indorsed upon the articles, or a "certificate" stating the causes, is to my mind of the utmost significance. Ship's articles are intended to be the authoritative evidence of the agreement, and the visé of the consul is expressly to protect seamen (and, indeed, masters as well) from just the uncertainties which arise from disputes like this. I do not believe that any master, with a good case against his crew for "incompetence" (Rev. St. § 4581), or "unfitness" (British Merchant Shipping Act, § 188), would have discharged the whole body of them without this protection to himself. Least of all would he have omitted this precaution, if, as he says, they were all willing to be discharged, and there could have been no dispute to settle and no doubt of the result.

Therefore it seems to me as clearly proved as such facts can be that the discharge was colorable, a cover to avoid the continued payment of American wages. Whether under British law the discharge, which had never the written sanction of the consul, could under any circumstances be valid, I need not inquire. It follows that there must be a reference to compute the wages of the libelants between June 8 and September 15, 1920, less such earnings as they made, or could have made, during that time. In addition to wages the libelants are entitled to their keep, which the parties have agreed upon at the rate of $10 a week.

There will be an interlocutory decree for the usual reference before a commissioner.