### THE GOLDEN SUN.
### WEEKS v. MATSON NAV. CO. et al.
### No. 8452–Y.

District Court, S. D. California, Central Division.

Dec. 11, 1939.

signed shipping articles as an able-bodied seaman for a voyage to Australia and·return to the United States at a wage of $72.50 a month, on the steamship "Golden Sun", owned by the Matson Navigation Company, a corporation, and its successors, the respondents. The wages agreed upon and the conditions of employment were as provided in the agreement dated February 4, 1937, between the Sailors' Union of the Pacific, of which the libelant was a member, and the group of steamship companies of·which the respondents were members. From the very beginning of the voyage, difficulties developed between the libelant and other members of the crew. The ship stopped at Honolulu for bunkers for a period of four hours. He sought to have the crew hold up the ship over night so that they might have shore leave. At Port Adelaide, he engaged in a fist fight with the boatswain when the latter called his attention to the fact that he was "soldiering" on the job, and had taken two hours to do work that should not have taken over ten or fifteen minutes. One of his blows struck the chief officer, who sought to stop the altercation because there were women passengers near. The matter was brought before the deck crew. It was suggested that the two men apologize to each other, shake hands and forget the incident. Weeks declined to do so and challenged the boatswain to further fight. When the ship arrived on a Saturday, October 23, 1937, at Port Adelaide, due to conditions of the wharf, it was necessary that she lie at the roadstead until late Sunday evening or Monday morning following. Weeks insisted that the crew demand that the Captain furnish them with transportation to Port Adelaide, some nine miles up the river, and give them shore leave. His proposal was voted down by the men. When the Australian authorities boarded the ship and requested that, in compliance with Australian law, the crew surrender to the Captain for safe-keeping their certificates of identification or passports, Weeks refused. He did not do so until the following day, when he went ashore. He stayed drunk during the entire seven-day period when the ship lay at anchor in Adelaide, for which he was logged for five days. He visited the ship while drunk, but did not work. One day, October 26, 1937, he worked approximately one hour. Then he said to the junior third mate, "To hell with this", quit his work, .

David A. Fall and Perry G. Briney, both of San Pedro, Cal., for libelant.

Overton, Lyman & Plumb, of Los Angeles, Cal., for respondents.

YANKWICH, District Judge.

On September 18, 1937, at San Francisco, California, libelant Thomas A. Weeks,

changed his clothes and went ashore. When asked to work at Melbourne, he complained of illness. Examined by a doctor, he was declared fit for duty. His absence was resented by members of the deck crew who could not have their leave when he was not working as they had to carry his share of the work. A meeting was held and the deck crew, by a substantial majority, decided that, in view of his troublesome attitude on the entire voyage, the master should be requested to discharge him. The Union delegate carried the message to the master with the statement that *"the crew would not sail with him any longer."* The Captain asked Weeks to appear before the American consul, at Melbourne, informing him that "he would be paid off." The Consul, on November 5, 1927, took the written statements of the Union delegate, the carpenter, the boatswain, the Captain and Weeks, and examined the ship's log.

As the discharge was determined upon, Weeks agreed to it and the words "mutual consent" were written on the certificate of discharge prepared by the American Consul, attached to the shipping articles. In the shipping articles also, that is given as the ground, although in signing the release on the crew list, Weeks wrote the words "under protest", under his signature.

The Captain, in his deposition, stated that Weeks had agreed "to pay off under mutual consent".

■ Evidently, he later changed his mind and when he signed the release on the articles he indicated his protest. Weeks was paid off, and returned to the United States, as a passenger, at the owners' expense. In a libel in personam and in rem filed against the vessel and its owners, he claims unlawful discharge and seeks to recover wages at the rate of $72.50 a month from the fifth day of November, 1937, to the 11th day of February, 1938, damages for wrongful discharge in the sum of $500.00 and such sum as the court might determine due him for waiting time, under U.S.Rev.Stats., Sec. 4529, 46 U.S.C.A. §

596. The provision calling for the intervention of an American Consul in discharging a seaman in a foreign port, U. S. Rev. Stats. Sec. 4580, 46 U.S.C.A. § 682, is very old in our law. The first enactment dates back to the act of February 28, 1851, 2 Stats. 203; See: Tingle v. Tucker, 1849, Fed. Cas. No. 14,057. It was made more for the benefit of the seamen, than of the owners of a ship. It seeks to protect them against arbitrary discharge or discharge for causes not warranted by the practices under maritime law. Since its enactment, it has been determined definitely that the intervention of the Consul is a condition precedent to a valid discharge. The master who, without seeking such intervention, discharges a seaman, runs the risk of having to prove the justness of the discharge. As said by Attorney-General Caleb Cushing: "He [the master] had no right to determine of himself the facts on which he assumed to act, nor to consummate the discharge without intervention of the consul." Discharge of Seamen, 7 Op.Atty.Gen.1855, p. 349, 350.

And see: Hathaway v. Jones, D.C.Mass. 1863, Fed.Cas.No.6212; Discharge of Seamen in Foreign Port, 16 Op.Atty.Gen. 1879, page 268; Nieto v. Clark, 1858, D.C. Mass., Fed.Cas.No.10,262; The Annie, D.C. N.Y., 1904, 133 F. 325; Mattes v. Standard Transportation Co., D.C.N.Y.1921, 274 F. 1019, 1023.

■ The consul's certificate giving the ground for discharge is prima facie evidence of the existence of just cause. See: The T. F. Oakes, C.C.Or., 1888, 36 F. 442; Campbell v. The Uncle Sam, D.C.Cal.1856, Fed.Cas.No.2372; The Oregon, D.C. N.Y. 1918, 254 F. 752; McAvey v. Emergency Fleet Corp., D.C., 15 F.2d 405, 1927, A.M.C. 184.[1]

■ While one act of disobedience does not suffice [The "Donna Lane", D.C. Wash.1924, 299 F. 977] the testimony before the Consul, which was amplified in great detail in the depositions before the court, warrants the conclusion that the discharge of the seaman was right, that he was guilty of continuously obstreperous

---

[1] Some cases hold that the certificate of the consul is conclusive evidence of the ground of discharge and can be impeached only for fraud. Lamb v. Briard, 1848, Fed.Cas. No. 8010; The Paul Revere, D.C.N.Y.1882, 10 F. 156.

I am not in accord with this view. To give to the consul's act absolute finality would clothe him with a power which does not ordinarily attach to one exercising administrative powers or powers which, at best, are those of an umpire to whom a controversy is submitted, or whose consent is necessary to the doing of an act.

conduct and of several acts of disobedience which threatened the discipline and morale of the crew and the safety of the ship. The Union delegate, chosen by the crew for the voyage, went so far as to state that he feared that had Weeks continued on the voyage, he would have gotten into physical altercations with other members of the crew that might have resulted fatally.

Bear in mind that the master was requested to take action by the fellow union members of the libelant, that it was they who expressed to the master and, afterwards, to the Consul, their inability to continue the voyage with libelant, and the conclusion is inescapable that, given the ordinary feeling of fellowship between workers united in the same union, the provocation must have been unbearable to lead to the request. But the libelant insists that this Court is without power to determine the rightness or wrongness of the discharge, because he was not confronted by the witnesses who testified against him before the consul and was not asked to bring witnesses to testify for him.

The consul examined each witness separately and took the defendant's own statement in which, while admitting his absence without leave, he denied that he had refused to work or had been guilty of other disobedience. Ordinary rules of evidence or procedure do not apply to those who exercise executive or administrative functions or functions akin to them. And when the duty to determine a fact is placed in the hands of an administrative functionary, there is no requirement that the usual incidences attending upon a judicial or quasi-judicial hearing be present. It is enough that the functionary has before him facts upon which to act. Were it otherwise, the beneficent informality of administration would be turned into formal judicature and the aim of speedy, non-technical determination of facts, which is behind all administrative law, would be subverted. See: Auffmordt v. Hedden, 1890, 137 U.S. 310, 11 S.Ct. 103, 34 L.Ed. 674; Origet v. Hedden, 1894, 155 U.S. 228, 15 S.Ct. 92, 39 L.Ed. 130; Norwegian Nitrogen Co. v. United States, 1933, 288 U.S. 294, 315, 319, 53 S.Ct. 350, 77 L.Ed. 796; and see, John Dickinson, Administrative Justice and The Supremacy of Law in the United States, 1927, pp. 106–108; 190–192; 266–267; 271–294; 297–299.

The statute does not require the consul to hold a hearing.[2] Nor does the consul discharge the seaman. He merely consents to his discharge by the master "if it appears" to him that grounds exist.

Of course, it is assumed that the consul will not grant his consent and relieve the master of the possible penalty for wrongful discharge, unless satisfied, from the facts, that grounds exist. See: The W. F. Babcock, 2 Cir. 1898, 85 F. 978, 982. If he hears witnesses and examines the entries in the ship's official log—as the consul did in this case—he has performed his duty. If we were to impose upon him the duty of confronting witnesses with each other and subject all to cross examination, we would turn his office into a court.

And if this were done, no reason could be suggested for not going to the extreme of allowing the seaman complained against the right to counsel.

The nature of the consul's intervention and the entire history of administration speak against such interpretation.

This conclusion makes the problem here involved easy of solution. The evidence before the consul and the evidence in this court show that the discharge was right.

More, the testimony of the master and the consul's certificate indicate clearly that the discharge was agreed to. The libelant has chosen to absent himself from the trial. So the narrative of events which resulted in the insertion by the consul into the certificate of the ground of discharge as "mutual consent" is not controverted.

Uncontradicted also are the statements of the chief officer and the Captain that, prior to the intervention of the consul, Weeks, at Melbourne, had "asked to be paid off."

So that, regardless of the sufficiency of the showing of conduct warranting discharge, the libelant is bound by the consul's decision. See, Gold v. Matson Navigation Co., 9 Cir., 1934, 73 F.2d 808, 1935 A.M.C. 125.

The libel is dismissed, with costs to respondents.

---

2 [7] The "inquiry" of which Section 685 speaks (46 U.S.C.A.) does not, as libelant claims, relate to a discharge under section 682. The "inquiry" there contemplated is that which follows a justifiable complaint to the consul by a seaman.

We do not have such a situation here.