Richard J. MACKENSWORTH

v.

MATHIASEN'S TANKER INDUSTRIES, INC.

No. 233 of 1959.

United States District Court
E. D. Pennsylvania.

Dec. 27, 1961.

Harry Lore, Philadelphia, Pa., for libellant.

Robert N. Ferrer, Philadelphia, Pa., for respondent.

VAN DUSEN, District Judge.

Libellant was employed, in accordance with foreign Shipping Articles (Exhibit L–1A), as a seaman aboard the S.S. AMERICAN MARINER, an experimental electronic research ship operated by the respondent tracking missiles on a national defense project for the United States of America.

At about 0200 on April 27, 1959, while the vessel was anchored at Sandy Island Anchorage, St. Johns, Antigua, libellant came aboard from shore leave with two bottles believed by his superiors to have contained liquor. Ships Order 1 (Exhibits R–6 and R–7) prohibited the bringing aboard or consuming on board by any member of the crew of alcoholic beverages, including "Whiskey, wine, gin, beer, rum, etc." The third mate on watch at the gangway (Mr. Onions) asked that the bottles be surrendered by libellant, who said "I am taking them" and pushed past the mate to the crew area (Exhibit L–1H).[1] At page 12 of his deposition taken October 7, 1959 (Document No. 27), Mr. Onions testified:

"I was still at the gangway, and he passed me with two bottles of liquor. He made no attempt at all to hide them.

"So I said, 'Look, you can't bring liquor on board. You know the order and you know the trouble we had.'

"And he said, 'Well, I'm bringing mine aboard,' and he brushed past me, and he went somewhere in the area there, in the 'tween-deck area, * * *."

Mr. Onions then sent for the Chief Mate, Mr. Golden, who testified as follows at pages 14–15 of his deposition taken October 28, 1959 (Document No. 26):

"* * * I told Mackensworth that I wanted the liquor which he had unlawfully brought aboard the vessel. Mackensworth told me at the time that the liquor was hidden aboard ship and that I couldn't find it if I searched for it, and so on and so forth.

"I ordered him to surrender it to me then and he stated that he would not do so. I told him I would have to tell the master of the vessel, Capt. McPherson, of the incident, if he did not do so. He told me that if I was foolish enough to bring this to Capt. McPherson's attention that certain strange and mysterious occurrences might happen aboard the ship.

"Q And what did he tell you, for example, what strange things he was talking about?

"A He stated generally that we might find that our anchor chain would mysteriously break, that acid had been known to weaken anchor-chain links before. Secondly, that the wiring aboard the ship, and more specifically the electronic wiring might suddenly have short circuits in it. And, as I recall, he also stated that the rope yarns might be found in the rose boxes in the bilges.

"Q. What effect would that have?

"A If a hold or an electronics area should flood we wouldn't be able to pump the water out of the hold or the electronics area, the rope yarns would plug up the piping system in that particular area.

"Q When he made these statements to you what did you say to him?

"A I warned him of the seriousness of the remarks, that they could be taken as an intent to sabotage the vessel, and the vessel was Govern-

---

1. Another member of the crew returned to the ship with libellant in possession of a bottle containing an alcoholic beverage (Scotch whiskey), which was surrendered at the gangway. Libellant appeared to have had something to drink but he was not intoxicated (p. 21 of Document No. 26).

ment owned and on a classified mission, and it evidently had no effect on Mr. Mackensworth."

The Chief Mate then searched libellant's cabin for the bottles but was unable to find them. He told libellant to stay in his cabin until notified otherwise (p. 16 of Document No. 26). At 0800, libellant was brought to the Captain's cabin by order of the Captain. The Captain warned him of the seriousness of (a) the refusal to obey a lawful command, (b) the violation of the ship's rules, and (c) his statement regarding sabotaging the vessel. The Captain then ordered libellant to produce the bottles of liquor. Libellant answered "No comment" to everything the Captain said. The Captain told libellant "to think it over for an hour, to go below and to return at about nine o'clock" (p. 17 of Document No. 26). Libellant failed to return at nine o'clock and the Chief Mate had to go get him. At this time, the Chief Mate, whose testimony as quoted in these findings is accepted, testified that the following occurred (pp. 18–20 of Document No. 26): [2]

"A  Capt. McPherson warned him again about the seriousness of the charges that had been made against him, advised him to speak up in his own behalf, at least, and to produce the liquor which he had admitted bringing aboard the vessel, and if he did not obey a lawful command think of the consequences of his act.

"Q  Did he state what those consequences would be to Mackensworth?

"A  Yes, sir. He warned him that if he continued to disobey a lawful command it would result in being confined in irons at the master's option, on bread and water, and a full meal every fourth day, if this became necessary.

"Q  What, if anything, did Mackensworth say in answer to the captain's comments?

"A  He just kept on with his statements of, 'No comment,' or, 'I refuse to answer,' and would not give the captain any answers to any of his questions.

"Q  Did Mackensworth state at that time why he refused to answer?

"A  I believe he stated something to the effect that on the ground that it would tend to incriminate him, or some such thing.

"Q  So that he refused to answer the captain's questions and refused to obey the order to turn over the liquor; is that correct?

"A  Yes, sir, he did.

"Q  What instructions or orders then did the captain give to you?

"A  The captain ordered me to take Mackensworth to the ship's hospital and confine him in irons until such time as the order should be obeyed.

"Q  Did you do so?

"A  Yes, sir, I did.

2. At the nine o'clock discussion, the radio operator, who took notes, and the boatswain were present, as well as the Captain and Chief Mate (see Exhibit L–1E). Libellant testified that Lt. Col. Stulting, an Army representative assigned to the ship, was also present (N. T. 46–47). The transcript taken by the radio operator read as follows (see Exhibit L–1E):
"Captain: 'Will you, Mackensworth, produce the 2 bottles of liquor and turn them in to the custody of the Master or his representative?'
"Mackensworth: 'I refuse to answer on the grounds that it might incriminate me.'

"Captain: 'Mackensworth, are you familiar with Section 4599 paragraphs 4 and 5 of laws relating to vessels?'
"Mackensworth: 'Same as before.'
"Captain McPherson then read Section 4596 paragraphs 4 and 5.
"Captain McPherson: 'Mackensworth, I am giving you another chance to answer.'
"Mackensworth: 'Same as before.'
"Captain: 'Very well, Mr. Golden place Mackensworth in irons to remain there until such time as Mackensworth obeys lawful orders.'"
Section 4596 of the Revised Statutes referred to above appears in 46 U.S.C.A. § 701.

"Q Well, so that we understand what you mean by 'confinement in irons,' will you please tell us specifically what you did.

"A Mackensworth was handcuffed, leg irons were attached to his ankles, there was no weight on the leg irons, it was a length of chain between the irons approximately 16 to 18 inches long, they were fixed rather loosely so they wouldn't cause any irritation to his skin, and the same thing was done with the handcuffs, and they were not attached to anything else. He was allowed to walk around in the area.

"Q How long was the chain between the handcuffs?

"A I'd say approximately 4 inches, 4 to 5 inches, somewhere.

"Q And would describe for us the area which you have stated was a hospital or part of the hospital in which he was confined.

"A It was a room about 12 to 15 feet wide and 20 to 25 feet long, contained five bunks, it was air conditioned and had a toilet, wash basin and bathtub. The bunks all had mattresses and linen bedding on them all made up, and there were two wardrobe cabinets and a small locker in the area.

"Q What provisions were made for his meals?

"A He was given full meals three times a day, * * *."

At no time while aboard the ship did libellant deny that he had brought liquor aboard the ship (p. 21 of Document 26). The ship left Antigua on the afternoon of April 27, 1959.

On the morning of April 28, libellant was brought back to the Captain's office, when the official log entry (Exhibit L–1J) was read to him and he signed it, the Captain and the Chief Mate signing as witnesses.[3] At this logging, the libellant's union delegate, among others, was present but made no comment.

On the afternoon of April 29, the Captain had libellant brought to his cabin again and said, "I want to try to help you out" (N. T. 63). He was again questioned about allegedly bringing the bottles of liquor aboard (N. T. 62).

On April 30, two bottles were found in libellant's personal effects and, when shown to him by the Chief Mate, libellant admitted, and so testified, that they were the bottles which he had brought aboard ship. The Chief Mate has testified that libellant admitted that such bottles had contained liquor (see Exhibit L–6).

On May 1, the vessel arrived in Trinidad and libellant sent a note by another member of the crew to the U. S. Consulate (N. T. 68–69) stating that the Captain was holding him in confinement without statutory authority and concluding, "I trust you will take immediate action" (see Exhibit L–3). On the same day, the Master and Chief Mate discussed with the Vice Consul the incident concerning libellant and the desirability of repatriation but were advised that no action could be taken on any discharge unless libellant was present.

On the early morning of May 2, 1961, the Captain, Chief Mate, and libellant appeared at the office of Vice Consul Harte, Port of Spain, Trinidad, who conducted an inquiry into the propriety of the Captain's discharge of libellant for repatriation to the United States of America. The ship's representatives presented to the Vice Consul many docu-

3. The log entry describes the offense committed as follows:
   "1. Direct disobedience of Ships Order No. 1, 'No alcoholic beverages of any kind are to be brought on board or consumed on board by any member of the crew. This includes: Whiskey, Wine, Gin, Beer, Rum, Etc. 2. Continued refusal to obey lawful orders of Master. 3. Threatening sabotage to vessel."
   A copy of the official log entry was given libellant.

ments,[4] including the following which have not been mentioned above:

A. Letter dated 4/27/59 from the Captain to Officer in Charge, U. S. Coast Guard Marine Investigation (Exhibit L–1D), which included these paragraphs:

"3. The Master's decision to confine Mackensworth was based on two factors. (a) The man's refusal to obey a lawful order 'To hand over liquor unlawfully brought on board the ship. (b) Prevention of possible sabotage to the vessel by Mackensworth as evidenced by his, Mackensworth statements to the Chief Officer, enclosures (a).

"4. This man will be interviewed by the ship's Medical Officer with possible question as to the full sanity of Mackensworth. It would appear that this man possesses a deep rooted aversion to lawful authority and desires to appear as a martyr against rules of behavior and authority. A medical report will be appended.

"5. It is the Master's opinion that Mackensworth should be prevented from sailing on U. S. Flag Ships. A man of this caliber or afflictions is definitely a detriment to the U. S. Merchant Marine. He could well prove a danger to either ship's personnel or vessel's equipment.

"6. Mackensworth will be held in custody to prevent injury to himself, other personnel or ships equipment until such time as the vessel returns to port. At the first opportunity this man will be paid off the vessel and repatriated to the United States."

B. Letter dated 4/28/59 from the Medical Doctor of the ship to the shipowner (Exhibit L–1I), which included this language:

"* * * I am in full agreement with the Captain that this crew member be removed from the ship as soon as possible, as a security measure, so that his status may be determined elsewhere for the betterment of all concerned."

C. Letter dated 4/29/59 from Lt. Col. Stulting as Officer in Charge, Project DAMP, to the shipowner (Exhibit L–1K), including this language:

"2. The AMERICAN MARINER is an experimental electronic research ship engaged in a vital national defense project. The classified nature of the project, the complex and costly research equipment aboard and its sensitivity to damage are such that personnel aboard should be carefully selected for reliability. Any crew member who fails to obey lawful orders or threatens sabotage to ships equipment is considered highly undesirable.

"3. It appears that this man should be removed from the vessel as soon as practicable."

All these documents were available to libellant, but the only one he chose to examine and sign was the Shipping Articles, which he signed ultimately as discharged "under protest." The Vice Consul warned him that the charges against him were rather serious and read pertinent extracts from the consular manual to him. (Exhibit R–3, Section 526.2 and first sentence of 526.34). The libellant said nothing when he was asked if he had anything to say in his behalf. The Vice Consul informed the libellant that on the basis of the information available to him,[5] he would have to approve his discharge and libellant continued to say nothing.[6]

4. Exhibits L–1A (Shipping Articles), L–1C1 to L–1C4, inclusive, L–1D, L–1E, L–1F, L–1G, L–1H, L–1I, L–1J, L–1K, L–1L, R–2A and R–2B.

5. Oral statements made to him by the Captain and Chief Mate, as well as the documents, were considered by the Vice Consul (N. T. 418).

6. The seaman's action certificate of discharge (dismissal for cause) (Exhibit L–1B) was inadvertently dated incorrectly as May 1, 1959, instead of May 2, 1959, which was its date of issuance.

Except for paragraph 22(b), which is approved after deleting the last five words,[7] respondent's Requests for Findings of Fact (pp. 1–14 of Document No. 33) are adopted as findings of the trial judge in addition to the findings in this opinion. All requested findings of libellant (Document No. 32) which are inconsistent with the findings made and adopted in this opinion are denied.[8]

Libellant claims in this action filed July 2, 1959, (1) his wages to the end of the voyage on May 2, 1959, including overtime (less amounts he earned on other ships between his discharge on May 2 and December 23, 1959) and a month's penalty wages, exclusive of overtime, under 46 U.S.C.A. § 685, together with 4% interest on such sums, (2) "found" or subsistence at the rate of $8.00 per day from May 2, 1959, until July 9, 1959, when he reshipped for the first time after May 2, and (3) damages for pain, suffering and humiliation from his confinement in irons from April 27 to April 30, 1959, and thereafter in the ship's hospital not in irons until May 2, 1959 (see pp. 18–20 of libellant's brief, being Document No. 34).

A. The confinement of libellant in irons was authorized by 46 U.S.C.A. § 701.[9]

▮▮▮▮▮ Congress has authorized confinement in irons "for wilful disobedience to any lawful command at sea." Libellant wilfully disobeyed several lawful commands issued by his superior officers in efforts to carry out Ship's Order 1, prohibiting the bringing of alcoholic beverages on the ship. It is not necessary to decide whether the two bottles brought aboard by libellant contained alcoholic beverages at the time they were brought aboard on April 27, as opposed to the time they were discovered by the Chief Mate on April 30, since the ship's officers clearly had the right to order delivery to them of a whiskey-type bottle such as L–4, at least for the purpose of determining its contents,[10] particularly in view of the failure of libellant to admit bringing aboard two bottles and stating that they did not contain liquor.[11]

7. This finding, as worded, is unnecessary since there is no need to decide whether the bottles contained liquor when brought aboard, as stated at page 10 below.

8. The following paragraphs of libellant's Requests for Findings of Fact are correct as stated: 3–9, 16, 24, 28, 31–37, 39, 44 and 45.

9. This section provides:

"Whenever any seaman who has been lawfully engaged * * * commits any of the following offenses, he shall be punished as follows: * * *

"FOURTH. For wilful disobedience to any lawful command at sea, by being, at the option of the master, placed in irons until such disobedience shall cease, * * *.

"FIFTH. For continued wilful disobedience to lawful command or continued wilful neglect of duty at sea, by being, at the option of the master, placed in irons, on bread and water, with full rations every fifth day, until such disobedience shall cease, * * *."

10. In addition to the whiskey brought aboard by the other crew member who returned to the ship with libellant on the early morning of April 27 (see footnote 1) and the whiskey found on April 27 in libellant's cabin, which whiskey belonged to his roommate, a utility man had brought liquor on board the vessel on April 26 so that the ship's officers were fully justified in being diligent in enforcing Ship's Order No. 1.

11. Libellant was not accused of a crime when asked to turn over bottles alleged to contain liquor and his silence in view of such accusations could be considered by the ship's officers. See Commonwealth v. Vallone, 347 Pa. 419, 421, 32 A.2d 889 (1943); Commonwealth v. Bolish, 381 Pa. 500, 522–523, 113 A.2d 464 (1955); United States ex rel. Vajtauer v. Comm'r. of Immigration, 273 U.S. 103, 111–113, 47 S.Ct. 302, 71 L.Ed. 560 (1927); United States v. Anthony, 145 F.Supp. 323, 334–5 (M.D.Pa.1956). In the Vallone case, the court said:

"The justification of this rule is to be sought in the age-long experience of mankind that ordinarily an innocent person will spontaneously repel false accusations against him, and that a failure to do so is therefore some indication of guilt. Of course, it is far from conclusive; it is analogous to the rule which permits evidence of the flight of the accused, his demeanor and conduct when charged with crime or taken into custody, and

On April 27, 1959, libellant wilfully disobeyed the lawful commands of the third mate when he came aboard, of the Chief Mate a few minutes later, and of the Captain (the Master) at 0800 and succeeding occasions in refusing to turn over these bottles or, at the least, L–4. His threats of sabotage to the vessel, which were never withdrawn or recanted also constituted "wilful disobedience to lawful command." As stated in The T. F. Oakes, 36 F. 442, 445–446 (C.C.D.Oregon 1888), which is cited by libellant at page 14 of his brief (Document No. 34):

> "By the general maritime law a master is authorized to discharge a seaman at either a foreign or domestic port for continued disobedience or insubordination, and such discharge terminates the relation of such seaman to the vessel. * * *
>
> * * * * * *
>
> " * * * a deliberate and continued attitude of insolence and defiance to his superiors, * * * is in effect disobedience and insubordination * * *."

B. The Vice Consul was justified in approving the discharge under 48 U.S.C.A. § 682.

■ The Vice Consul was clearly authorized to approve and consent to the discharge of the libellant by the Captain on the information before him on May 2, 1959. See 46 U.S.C.A. § 682. The libellant was present and given an opportunity to offer evidence and testify on his own behalf. The Vice Consul complied with the applicable regulations governing such inquiries. See 22 C.F.R. 82.16; Vol. 2, § 526.2 of U.S.Foreign Service Manual (see Exhibit R–3).

In The Golden Sun, 30 F.Supp. 354, 357 (S.D.Cal.1939), the court used this language with reference to a Consul's functions under 46 U.S.C.A. § 682:

> "Ordinary rules of evidence or procedure do not apply to those who exercise executive or administrative functions or functions akin to them. And when the duty to determine a fact is placed in the hands of an administrative functionary, there is no requirement that the usual incidences attending upon a judicial or quasi-judicial hearing be present. It is enough that the functionary has before him facts upon which to act. Were it otherwise, the beneficient informality of administration would be turned into formal judicature and the aim of speedy, non-technical determination of facts, which is behind all administrative law, would be subverted. [Citing authorities.]
>
> "The statute does not require the consul to hold a hearing. Nor does the consul discharge the seaman. He merely consents to his discharge by the master 'if it appears' to him that grounds exist.
>
> "Of course, it is assumed that the consul will not grant his consent and relieve the master of the possible penalty for wrongful discharge, unless satisfied, from the facts, that grounds exist. See: The W. F. Babcock, 2 Cir.1898, 85 F. 978, 982. If he hears witnesses and examines the entries in the ship's official log—as the consul did in this case—he has performed his duty. If we were to impose upon him the duty of confronting witnesses with each other and subject all to cross examination, we would turn his office into a court.
>
> "And if this were done, no reason could be suggested for not going to the extreme of allowing the seaman complained against the right to counsel.
>
> "The nature of the consul's intervention and the entire history of administration speak against such interpretation."

---

other acts and circumstances indicating his reaction to the situation in which he is involved. The accusatory statement, being hearsay, is not admissible as evidence in itself of the facts which it asserts, but merely to show what the charges were to which defendant offered no denial; its probative force is derived not from the credibility of the accuser, but from the silence of the accused in response to it."

On October 5, 1959 the deposition of the Captain (Kenneth S. McPherson) was taken *de bene esse* for use at trial at Mobile, Alabama (Document No. 25). During the deposition, counsel for libellant requested, for purposes of cross-examination, copies of (1) a statement made by the Master to the shipowner (Exhibit R–2B), (2) a statement he made to the Coast Guard (Exhibit L–1D), and (3) the transcript of the conference between the Captain and the libellant on April 27, 1959 (Exhibit L–1E). Copies of these documents had been previously sought (September 30, 1959) by libellant in a Motion To Produce (Document No. 13), which had not been ruled on at the time of the deposition. After the deposition was taken, counsel for libellant filed a Motion To Suppress (Document No. 16) the deposition, relying on Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), and this Motion was denied by this court (Document No. 18). The Motion To Suppress was renewed at the start of the trial (N. T. 2–10) and respondent resisted it on the ground, among others (N. T. 11–14), that the testimony of the Captain in the deposition was completely consistent with the documents requested. See Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). It was understood at the trial that the trial judge reserved ruling on the admissibility of this deposition, which was offered by respondent, as well as on the Motion to Suppress the deposition (N. T. 473 and 481).

■ At the time of filing its Requests for Findings of Fact and Conclusions of Law, counsel for respondent stated, at page 1 of his brief (Document No. 35) and in the letter of November 29, which has been stapled to the backer on that brief, that he was content not to have the deposition considered by the court and withdrew his offer of the deposition. Counsel for libellant, in his letter of December 1, 1961, which has been attached to the backer of his brief (Document No. 34), now states:

"Since the right of cross-examination is such a fundamental one, I do not see how the respondent can, on the one hand, deny the libellant's access to the documents which would have been used to cross-examine the Master, and on the other hand, say that the entire testimony of the Master is moot because it did not choose to rely on it in forming its Findings of Fact and Conclusions of Law."

It is noted that during the trial libellant emphasized that he wished that "the entire deposition" be suppressed (N. T. 8). Under these circumstances, the libellant is not entitled to a new trial or supplemental trial to offer part of the deposition which he did not offer at the trial. The deposition will not be received in evidence and has not been considered by the trial judge in making the Findings and Conclusions in this opinion. It is not necessary to consider what ruling would have been made if the respondent had not withdrawn its offer of the deposition.

Also, the trial judge has not considered the cross-examination of libellant on the last day of the trial (N. T. 432–451) in view of the second paragraph on page 1 of respondent's brief (Document No. 35) and of the objection to this testimony by libellant at the trial.

Counsel for libellant has informed the trial judge by phone on December 26, 1961, that his letter of December 1 was intended to request oral argument on the entire case and that he is not interested in presenting oral argument on the evidence questions covered by the preceding three paragraphs. It is not the custom of the trial judge to hear oral argument on requested Findings of Fact and Conclusions of Law, together with briefs, unless provision for this is made at the time of the trial. In this case, counsel for libellant made no request for such oral argument until after all such requests and briefs had been filed (N. T. 498–502a). Since both counsel will be given an opportunity to

present motions for amendment of the Findings, Conclusions and Order entered with this opinion (cf. F.R.Civ.P. rule 59, 28 U.S.C.A.), and ample opportunity will be given them to present argument on such motions, the trial judge does not believe that the request for oral argument on the entire case, as made by phone on December 26, is timely.

The Conclusions of Law requested by respondent (Document No. 33) are adopted by the trial judge in addition to the Conclusions of Law in this opinion. Paragraph 1 of libellant's requested Conclusions of Law (Document No. 32) is affirmed, paragraphs 2, 4 and 5 are denied, and paragraph 3 is denied insofar as it is inconsistent with this opinion.

Respondent is entitled to the entry of judgment in its favor.