## BOULTON and others *v.* MOORE.

*(Circuit Court, N. D. Illinois.  January 6, 1883.)*

1. SEAMEN'S WAGES—ON VOYAGE PARTIALLY BROKEN UP.

A contract for a voyage to be performed by seamen on vessels on the northern lakes is terminated by the necessary laying up of the vessel for the w. ter at an intermediate port; and where no provision is made in the contract for such a contingency, the seamen are entitled to the necessary expenses of their return to the place of shipment, and to their wages up to the time of their arrival at the intermediate port, and, *it seems*, to their wages during the necessary time occupied in their return to the place of shipment.

2. TENDER IN ADMIRALTY.

Any real offer to pay money by one then ready and willing to pay, is treated as a valid tender in the admiralty, without inquiry whether the money was produced or not, or in what form; but the offer must be without condition, and it should be renewed in the answer or distinctly made upon the record at some time during the progress of the litigation.

In Admiralty.

*C. E. Kremer,* for libelant.

*W. H. Condon,* for respondent.

DRUMMOND, C. J.    This is a libel for wages and traveling expenses against the defendant, the captain and owner of the schooner, Zach. Chandler.    The libelants shipped on the schooner at Chicago, on the eleventh and thirteenth of November, 1880, for a voyage to Erie, Pennsylvania.    The wages were to be four dollars per day.    The schooner met with adverse weather, and the winter set in earlier than usual, so that the schooner was obliged to lay up at Escanaba, in Green bay, on the twenty-third of November.    The captain, when it was ascertained that the schooner could not proceed on her voyage until the following spring, offered to pay the libelants the wages which had been earned, at the rate stated, up to that time, provided a full acquittance were given.    The libelants refused to receive the wages on these terms, and claimed that their expenses should be paid back to Chicago, the place of shipment.    This the captain declined to do, and the libelants did not, consequently, receive any compensation whatever, and in consequence the libel was filed for the amount of wages due to them, and for their expenses from Escanaba to Chicago.    There was no written contract made between the parties, no shipping papers signed, and nothing said by either party as to what would be the effect upon their rights, provided the voyage was delayed until the following spring.

It is not claimed that the voyage was absolutely broken up, or that it was prevented from being accomplished the next spring. The libelants did not offer to remain on board the vessel and complete the voyage. It seems to have been assumed between the parties that in consequence of the vessel being detained there during the whole winter, it did not become the duty of the libelants to remain, nor of the defendant to retain and pay them until the following spring. There would seem, therefore, to be great force in the position that the contract between the parties, however it may have been as to the voyage, was terminated by their voluntary act. But, independent of this consideration, I am inclined to think that under the facts stated the contract of hiring for the voyage must be regarded as terminated between the parties. Undoubtedly it was the expectation on both sides that the schooner would complete her voyage to Erie that fall; but, in the exercise of a reasonable discretion, having been laid up at Escanaba for the winter, although the voyage might be resumed in the following spring, it could not have been anticipated as a part of the contract under such circumstances that the libelants would have the right to remain there all winter, without any service rendered at the high rate of wages named, or that it was the duty of the defendant to pay them those wages until the end of the voyage in the spring. The navigation between Chicago and Erie is suspended on an average at least four months in the year, and we think it is the general understanding both among seamen and vessel-owners that the necessary laying up of the vessel at any intermediate point, for and because of the winter, is considered in this and similar cases, just before the close of navigation, as terminating the contract of service, and that the seamen are at liberty to abandon the voyage, and the vessel has a right to employ other seamen in the spring when navigation opens. If the detention were only for a short time, then, perhaps, this rule would not prevail; but considering the time during which the vessel is detained, it seems as though this is the only safe course to be adopted in such a case. In this respect, therefore, I agree entirely with the view taken of the case by the district court.

The only real controversy in the case seems to be in relation to the expenses of the libelants from Escanaba to Chicago. They do not claim their wages during the time occupied by the trip, and therefore, strictly speaking, the question of wages during the journey does not arise. When they were discharged at Escanaba, the captain offered them their wages up to that time, on condition that a receipt

in full were given; and it is claimed that this constituted a tender in the admiralty law of the amount that was actually due at the time. It is true that the same strictness does not exist as to tenders in admiralty as at common law. The rule as stated in 2 Pars. Shipp. & Adm. 484, is that "any real offer to pay by one then ready and willing to pay is treated as a valid tender, without inquiry whether the money was produced or not, or in what form." But in this case the tender was made, subject to the condition that a full acquittance should be made, and the offer to pay was not renewed in the answer, nor, so far as appears, was it ever afterwards repeated on the record before or during the progress of the litigation. No written intimation was given to the court after the decree of the district court, and it has not at any time been renewed in this court, although the counsel has said that his client has always been willing to pay that amount. Of his ability to do so this court has no knowledge. In a case cited in the notes to Parsons, one fact which constituted in the opinion of the court a sufficient tender was that it was renewed in the answer, and that was a case where the tender was accompanied with a request for a receipt. Page 484, note 1. In this case the district court allowed the libelants their wages up to the time of their discharge, and their expenses from Escanaba to Chicago, (*The Zach. Chandler*, 7 FED. REP. 684,) and the question is whether they were entitled to their expenses.

In the case of *The Steam-boat Lioness*, 3 FED. REP. 922, the district court gave the libelants their wages from the time of their discharge up to the time of their return to the place of departure, as well as their expenses during the return. In that case the vessel, in the course of her voyage, encountered ice in the Mississippi river and the voyage was broken up. It does not appear how the voyage was broken up, nor whether it was by the mutual consent of the parties. The case decides that the libelants were entitled to their expenses and wages during their return, irrespective of the fact whether the discharge was caused by the fault or act of the vessel-owner. The reasoning of the court, however, appears to proceed on the assumption of a discharge without cause, or a wrongful discharge. The court lays down the rule as well settled that it was the right of the mariners to be transported to their ports of shipment, leaving the inference that it was their right under the facts stated in the opinion. Of the numerous authorities cited in that case scarcely one can be said literally, however it may be in principle, to go the length claimed by the

court; that is to say, in a case where both parties must be presumed to know that the contract may be terminated by some act independent of either; for instance, by *vis major,* as in this case. Here, as we have assumed, there was no wrongful discharge or discharge without a cause, and there was no act done by the vessel-owner which terminated the contract between the parties. This was a verbal contract, but I do not see how, if it had been a written contract of the character proved, it could have affected the principle involved in this part of the case.

In the case of *The Hudson,* 8 FED. REP. 167, where the libelants, without any written articles, shipped on board of a packet running between Pittsburgh and Cincinnati, on the Ohio river, and on the arrival of the packet at Pittsburgh, the river being frozen over and navigation by reason of ice having been suspended for eight days, were discharged, the court held that they were entitled to their wages up to the time of their return to the place of shipment, as well as their expenses during their return. In that case I think it may be inferred, perhaps, that the libelants were discharged without sufficient cause, and in that respect it was different from the case under consideration.

Judge STORY has decided in several cases that where a neutral vessel is captured, it does not necessarily break up the voyage. If the capture is wrongful, the vessel may be released and the voyage proceed, and he therefore calls it, under such circumstances, a mere suspension of the voyage; and he has held that the mariner, under such circumstances, is entitled to his wages until his return to this country. *Emerson* v. *Howland,* 1 Mass. 45; *Brown* v. *Lull,* 2 Sumn. 443; and see *Brooks* v. *Dow,* 2 Mass. 39.

The acts of congress do not provide for the payment of the wages of mariners, or their expenses back to the port of departure, where there is no fault committed or act done by the vessel-owner. Whenever a vessel is sold in a foreign country and the seamen discharged, then three months' wages are to be given to them. Rev. St. § 4582. Where the service of the seaman is terminated before the period contemplated by the agreement, in consequence of the wreck or loss of the vessel, the seaman is entitled to his wages up to the time that the contract is thus terminated, but not for any further time. Rev. St. § 4526. It would seem that in the case of a delay for repairing a vessel, or in consequence of capture, it becomes a question whether the delay is a reasonable one. If it be long continued, de-

pending somewhat, of course, upon the cause of the delay, then it would seem as though the contract between the seamen and the vessel-owner must necessarily be terminated. 2 Pars. Shipp. & Adm. 86; and see *Woolf* v. *Brig Oder*, 1 Pet. Adm. 262.

Judge STORY admits that in a case of capture, followed by condemnation, the contract is dissolved, and the seamen lose their wages, unless there is a subsequent restitution of the property, or of its equivalent value, with an allowance of freight; and he says that it is the duty of the mariners to remain by the ship as long as there is any hope of recovery of the property; but the question recurs, how long is the mariner to wait until these facts are ascertained? And so in the case of repairs. Undoubtedly, if they can be completed within a short time, the contract remains. But suppose that it takes many months, or a year, or more, to make the repairs, as we can easily imagine there may be cases where they may take that time, is the contract still to continue between the seamen and the shipowners? The extent to which some of the courts have gone in allowing the wages of seamen is shown by the fact that they have permitted the representatives of the seamen to recover wages for the whole voyage, although the seamen may have died long before the voyage was terminated, (2 Pars. Shipp. & Adm. 58, note 4, and cases there cited,) and so when the seaman was sick and left in a foreign port. *Brunent* v. *Taber*, 1 Sprague, 243. In examining the cases cited, and others which might be named, one cannot avoid the conclusion that the courts of admiralty have adopted rules much more liberal to seamen than are applied to other persons who ordinarily make contracts with each other. They have appeared studious to guard at every possible point what may be considered as the equities of the sailor. They do not apply the same strict rules of construction to the contracts which he makes as in the contracts of other persons. If there is anything in his contract which the court thinks hard or unfair to the seaman, the court requires clear evidence that he made the contract with a full knowledge of what it contains, and his assent to such clauses therein written, and in the case of any unforeseen event occurring, or one not provided for or anticipated, perhaps it is not too strong an expression to say that the courts construe the contract upon the assumption of what the sailor would have claimed or inserted if the event had been foreseen or anticipated. Their contracts are regarded by the courts of admiralty under the influence of feeling quite as much as of logic. As "wards" of the court, they are treated with the tenderness of a guardian.

This was a contract for a service to be performed on board of the schooner in November, for a voyage between Chicago and Erie, Pennsylvania. The term of service did not extend further than the arrival of the schooner at that port. As has already been intimated, it must be presumed to have been within the knowledge of both parties that there was a chance for the voyage to be arrested by the approach of winter, and by obstructions caused by ice. It has been stated that a contract of service, as such, according to what is believed to be the universal understanding upon these lakes, is terminated by the necessary laying up of the vessel in the fall for winter; but there remains the question as to what is the right of the seamen when the voyage is thus terminated, where the contract is silent in case of the detention of the vessel from the causes named. Under ordinary circumstances, we think, it could be truly said that the event having happened which both parties had the right and whose duty it was to anticipate, that each was left entirely free; that the service having terminated, payment for the service actually performed would release the vessel-owner from all further obligations. On principle, it seems that no other rule could be established; but, as has already been said, this is not a case between ordinary persons, but a case between seamen and the owners of the vessel where circumstances have occurred, which have not been provided for in the contract. As was intimated by the district court in its opinion, we can imagine that cases might arise where it would become a question, even conceding that the expenses of the seamen were to be paid, to what point they might go,—whether to the point of departure or to the port where the voyage was to terminate; in this case the first being at Chicago, and the second at Erie. No doubt difficult questions might arise, in similar cases —depending upon the place between the two ports where the voyage was terminated for the season; but those would have to be decided under the special circumstances of each case, and need not now be anticipated here. The libelants desired to return to the place of departure, and it was not proposed to send them to the port of destination; in fact, the expense and difficulty of reaching that port were much greater.

In looking at the general current of the authorities upon the questions involved here, it seems as though the court could not escape the conclusion that, in favor of the seamen, their expenses should be allowed in this case, because they are seamen, and because a court of admiralty is bound specially to regard their interest.

This case has been the more fully considered by the court, and some of the questions, which only arise, perhaps, incidentally in the case, have been discussed and decided because of the general desire which has been manifested that the court should lay down some rule which will govern in cases of this kind; and it may be as well to state, although the question does not necessarily arise in this case, that the same rule which would award the libelants their expenses from Escanaba to Chicago, would also, although the claim was not here made, give them their wages during the short time occupied in the journey between the two places.

The question of wages and of expenses, where seamen are left on these lakes in the fall, under the circumstances which occurred in this case, is one of very considerable practical importance, because it is occurring in many instances every fall and winter. It would be desirable, as there has been so much controversy on the subject, that it should be determined by the supreme court of the United States; but in all cases where these questions arise, the amount involved is so small that it is hardly possible that they should go before that court, unless, perhaps, when the circuit justice and the circuit judge sit in the circuit court, in an admiralty appeal, and they should certify the questions to the court of last resort. *Ins. Co.* v. *Dunham*, 11 Wall. 1; *U. S.* v. *Emholt*, 105 U. S. 414.

The result of the whole matter is that this court substantially agrees with the district court, and will allow the libelants their wages up to the time of their discharge, and their expenses; and I think, as there is not the same sum due to each, the amount should be allowed to each libelant, and not, as the district court found, an aggregate amount due to the libelants together.

It will be seen it is important that the vessel-owners should have a written contract with the seamen, in which provision can be made, in any contracts entered into near the close of navigation, as to the rights of the seamen in case of the detention of the vessel at an intermediate port during the winter.

Where such contracts are fairly made and well understood by the seamen, there can be no doubt they would be binding on them.

END OF CASES IN VOL. 14