## LATTY et al. v. EMERGENCY FLEET CORPORATION.

(District Court, D. Massachusetts. April 12, 1922.)

No. 1819.

1. Seamen ⬬30—Master may punish insubordination by confinement, but not in jail of foreign country, except in extreme cases.

In view of Comp. St. § 8382, relating to insubordination, a master may punish insubordination by confinement; but the punishment should ordinarily be inflicted on board the vessel, and removal of a seaman from the vessel and confinement in the jail of a foreign tropical country is not justified, except in extreme cases.

2. Seamen ⬬30—Captain held not justified in sending insubordinate member of crew ashore for confinement.

Where an intoxicated member of a ship's crew, who had been talking in a mutinous way, resisting an attempt to put him in irons, etc., had not endangered discipline, and had quieted down, captain held not justified in

⬬For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ordering his arrest and confinement by the local police, especially where he made no formal accusation, and did not comply with Comp. St. §§ 8036, 8381, relative to entry in the log, etc.

**3. Seamen ⬛=30—Captain held justified in causing arrest of insubordinate member of crew.**

Where an intoxicated and insubordinate member of the crew had resisted attempts to put him in irons, and successfully defied the local police called in by the captain, and part of the crew was pretty well out of hand, captain *held* justified in sending to a warship for a boat's crew, and requesting his arrest and that of two others who were taking his part.

**4. Seamen ⬛=30—Insubordinate member of crew held entitled to damages for excessive force used in arresting him.**

An intoxicated and insubordinate member of a ship's crew, arrested and taken ashore by a boat's crew from a warship called in by the captain, had a just grievance, and was entitled to damages for unreasonable and excessive force used in removing him from the steamer; but where the most severe injury was inflicted on the trip to shore, while the captain was not in command, $100 *held* sufficient damages.

**5. Seamen ⬛=30—Evidence insufficient to show what personal effects were not returned to member of crew arrested and confined ashore.**

Evidence *held* insufficient to show what personal effects of a member of a ship's crew were not returned to him, on his arrest and confinement ashore for insubordination.

**6. Seamen ⬛=16—Member of crew, arrested for insubordination, but never legally discharged, held entitled to wages.**

The insubordinate conduct of an intoxicated member of a ship's crew, for which he was arrested and confined ashore, *held* not such as in legal effect to end his service on the ship; and hence, where he was not discharged pursuant to Comp. St. § 8382, he was entitled to compensation for the remainder of the term for which he shipped.

**7. Seamen ⬛=30—Members of crew, who interfered with attempt to arrest another member, held to have no claim for imprisonment.**

A member of a ship's crew, who interfered when the captain was attempting to put irons on another member of the crew, and threatened the local police with violent resistance when they were called in, and another member of the crew, who stood by ready to take part, if an actual fight developed, had no claim to damages because of their confinement ashore, and later on board the vessel.

In Admiralty. Libel by Ernest B. Latty and others against the Emergency Fleet Corporation. Decree in favor of Latty, and libel dismissed as to the other libelants.

Wendell P. Murray, of Boston, Mass., for libelants.

Lewis Goldberg, Asst. U. S. Atty., and Charles P. Curtis, Jr., both of Boston, Mass., for respondent.

MORTON, District Judge. This is a libel by the chief steward and two cooks on the steamship Lake Forkville to recover damages for assault and imprisonment by the master, and for wages and personal effects. I find the facts to be as follows:

The Lake Forkville was owned by the United States Shipping Board, Emergency Fleet Corporation, and was operated by the Mallory Lines. She left Norfolk about October 10, 1919, bound for the Azores and England. The incidents which form the basis of this suit occurred after her arrival at Ponta Delgarda, Azores, which was reached on October 31st. The chief steward, Latty, went on shore that day. When

he returned to the ship he was under the influence of liquor and was in an argumentative mood. He went to the captain's cabin, and there, according to his own testimony, had two more heavy drinks, one of whisky and one of cognac. The captain, chief officer, and supercargo were also in the room and were drinking. An altercation took place, which ended in the captain's attempting unsuccessfully to put Latty into irons. Latty, after talking to some of the crew in a manner calculated to make trouble, went to his room. The captain followed him there and again attempted to put irons on him. Latty, however, refused to submit, talked loudly to the crew, many of whom were colored men like himself, saying that he was standing up for their rights, and that the captain was a grafter. The libelant Benjamin, chief cook, interfered to prevent irons being put on Latty, and the other libelant, Vincent, also a cook, stood around on the outskirts, apparently ready to assist Latty and Benjamin, if occasion required.

The captain thereupon gave over his attempt to put Latty into irons and sent for the local police. When they arrived, Latty was quiet in his room. He refused to open the door, and it was broken in. He and Benjamin, who are both Haitians, talked to the local police, with whom, as they did not understand English, the captain and officers were unable to communicate by language; the result being that the local police refused to arrest Latty. Benjamin told them that, if they attempted to do so, the other colored members of the crew would interfere and prevent it. Latty was boisterous, loudly accusing the captain of being a grafter, and intending that the crew should hear him.

After the local police had left, the captain sent to the United States warship Arethusa, which was lying near by, for assistance. A boat's crew was promptly sent on board in charge of two officers. At the captain's request they arrested the three libelants. Latty resisted and was roughly handled. The three were taken ashore in the navy boat, the captain and supercargo going with them. On the way Latty jumped up and made trouble, and he was finally hit on the head with a police club by one of the bluejackets and knocked senseless. He was taken to the lockup and thence to the hospital, where he remained under treatment for about two weeks, during which time the steamer sailed without him. Just before leaving, the captain came to the hospital, and wanted to take Latty on board; but the hospital authorities considered him not sufficiently recovered to go.

The Lake Forkville sailed five or six days after the arrests. Just before she left, Benjamin and Vincent were brought on board from the lockup. They were placed in irons and confined in a room in the forepeak of the vessel, which had been occupied by the carpenter. Their irons were taken off later that day and were not again replaced. They were kept in confinement until the ship reached Avonmouth, England, a period of about ten days. Then Vincent, on his agreeing to go to work, was let out. Benjamin complained that he was ill from the effects of cold and poor food during his confinement. He was paid off and discharged, at his request, before the American consul in Cardiff, and went to the hospital there, where he remained five days. He later returned to this country in another vessel. Vincent returned on the

Lake Forkville. After Latty came out of the hospital at Ponta Delgarda, he secured a passage to this country on the Lake Farrabee, signing on as chief cook. He arrived in New York, still suffering, as he contends, from the effects of his injuries.

Up to this point, while it cannot be said that there is agreement as to the facts, they seem to me pretty clear on the evidence submitted.

Latty further testified that the captain, chief officer, supercargo, and second assistant engineer were engaged in a conspiracy to defraud the owners or operators of the vessel; that he was asked to become a party to it and refused; that he was ill treated and prosecuted for that reason, in order to discredit his testimony against them; that Benjamin also knew about the conspiracy, and on that account was ill treated and left at Cardiff; and that Vincent was brought home in order to separate the three witnesses, and thus prevent any attempt to bring charges against the captain and officers. The only bearing of the alleged conspiracy on the present case is that it is claimed to have furnished a motive for the captain to ill treat Latty and take action against him. But what the captain did is plain enough; and it seems to me unnecessary to decide whether such a conspiracy existed. The captain and officers deny Latty's testimony on this point in toto. The separation of the three men, on which the libelants much rely as evidence of a sinister purpose on the captain's part, does not, fairly considered, warrant that interpretation. The captain wished to take Latty along from Ponta Delgarda, and was prevented from doing so by the hospital authorities, and Benjamin was discharged at Cardiff at his own request.

[1] The first question is whether Latty was illegally assaulted or imprisoned. Similar cases have frequently arisen; one or two of those referred to below are curiously similar; and the law is well settled. Organized insubordination is mutiny, and is not to be condoned or tolerated. See Comp. Stats. § 8382. It is the duty of the master to maintain effective discipline on his vessel, and he has the power (now regulated by statute) to inflict punishment for that purpose. Confinement is a recognized form of punishment. But it should ordinarily be inflicted on board the vessel; causing a seaman to be removed from his vessel and confined in the jail of a foreign tropical country is treatment which is not justified, except in extreme cases. It removes the seaman from the surroundings to which he is accustomed, and from the control and protection of the master, and subjects him to dangers and difficulties which may be very great. The law is stated by Judge Story in U. S. v. Ruggles, 5 Mason, 192, Fed. Cas. No. 16,205:

"I am aware that it has been doubted, by very able judges, whether the law does authorize such an imprisonment on shore in a foreign port. My opinion, however, upon the most mature deliberation, is that it does authorize it; but I am also of opinion that the authority arises, and can be exercised only in cases of flagrant offenses, where there is a positive necessity of removal of the party offending from the ship to some place of safety on shore. The authority is of a very delicate and summary nature, and is justified by the same necessities which clothe private persons in other cases with extraordinary powers. * * * The master must have (as I think) a right, under such circumstances, to remove them from the ship, and to imprison them, as well for punishment as safety, if he does not choose (as he may) to dismiss them altogether from the employment. But in such a case the

imprisonment must be with the intent to take them again on board the ship for the voyage, or to bring them home, and not with the intent merely to punish them, and at the same time to dissolve their connection with the ship. The master can punish only to promote good discipline, and compel obedience to lawful orders on board of the ship. He is not clothed with judicial authority to sentence seamen to punishment for their offenses."

See, also, The Nimrod, Fed. Cas. No. 10,267, 1 Ware, 1; Jay v. Almy, Fed. Cas. No. 7,236, 1 Woodb. & M. 262 (Cir. Ct. Mass.); Johnson v. Ship Coriolanus, Crabbe, 239, Fed. Cas. No. 7,380; Buddington v Smith, 13 Conn. 334, 33 Am. Dec. 407; The William Harris, Fed. Cas. No. 17,695, 1 Ware, 373. In the last case Judge Ware said:

"I have held that in extreme cases, where a man proves incorrigibly disobedient and refractory, and where it is necessary, for the purpose of preserving order and discipline on board the vessel, that the master was justified in calling in the aid of the police, and sending a seaman to prison. But it is not a punishment to be resorted to, except in grave cases, and not until other means have been tried to bring a man to his duty. Under the circumstances of the present case, I think it was clearly unjustifiable. I decree the wages to be paid without deduction." 1 Ware, 385.

[2] At the time when the captain, with the local police, went to Latty's room and tried to arrest him, Latty was quiet. He had been talking in a mutinous way, resisting the attempt to put him in irons, and endeavoring to stir up the crew. But so far he does not appear to have endangered the discipline of the ship; he was drunk, and he had quieted down. He was no longer actively disobedient. It was to be expected, I think, that he would sober up and return to duty. The Lake Forkville was not at sea; she was in port, and there was ample authority at hand to enforce proper discipline, if Latty, on sobering up, continued insubordinate. It is not an infrequent occurrence for some member of the crew to get drunk and make a disturbance, without any serious consequences. The captain never made any formal accusation against Latty; and no entry was made in the log of his arrest, nor of the punishment inflicted on Benjamin and Vincent, as the statutes require. U. S. Comp. St. §§ 8036, 8381. It is not established that Latty's conduct, up to the attempted arrest by the local police, was such a serious and continuing danger to the good order and discipline of the vessel as warranted sending him ashore for confinement. Indeed, it is not easy to see on what ground the arrest by the local police was ordered by the captain; and I am satisfied that it was not justified. Both the captain and his chief officer were the worse for liquor at the time, and were not in a condition to exercise cool judgment.

[3, 4] The incidents surrounding this unsuccessful attempt brought about a much more serious situation. Both the authority of the captain and of the local authorities had been successfully defied. Benjamin had thrown hot grease over the second officer, who attempted to remonstrate with him, burning the officer badly enough to require treatment, and the colored members of the crew were pretty well out of hand. It was certainly necessary for the captain to regain control of them. He therefore seems to me to have been justified in sending for the boat's crew and requesting the arrest of the three men. I am, however, unable to agree that the removal of Latty from the Lake Forkville was

properly done. While he resisted, and was doubtless very aggravating, he was drunk and unarmed, and an overwhelming force was at hand to subdue him. There was no occasion to treat him as roughly as he was treated on the steamer, where her captain was in command and legally bound to protect Latty's rights to the best of his ability.

In my opinion, Latty has a just grievance and is entitled to damages for the unreasonable and excessive force used in removing him from the steamer. While exact evidence as to his injuries is lacking, I infer that not much harm was done to him at that time. The navy boat was in charge of her officers. Whether the bluejacket who hit Latty on the head on the trip to shore did so under orders, or on his own motion, is not clear. Capt. Forbes had not command in that boat, and nothing to do with that occurrence, which was when the most severe injury was inflicted. After Latty reached shore, he was properly cared for. Considering that the situation which justified Latty's removal from the vessel was brought about by the captain's bad judgment, although that, of course, did not excuse Latty's resistance, nor the other men's interference, I shall allow Latty $100 damages for the excessive and unreasonable force used on him.

[5] He testifies that his effects which he left in his stateroom were, except a few articles, never returned to him, although he asked for them afterwards. On the other hand, the second officer, Lawson, testifies that he and two other men, by the captain's orders, on the day after the arrest, collected Latty's effects from his room, which had been boarded up after he left it, and took them to Latty at the hospital. This testimony is not contradicted (except to some extent by Latty), and is not impeached. Latty's testimony is not reliable as to certain other details, and I am not disposed to accept his uncorroborated statement as to his having lost such a surprisingly large amount of personal effects as he describes. He very likely lost something, but I cannot sift out the truth from his exaggerations and falsehoods.

[6] According to Latty's uncontradicted testimony, he had signed articles on September 6, 1919, for six months. He was never legally discharged from the Lake Forkville, and his conduct was not such as in legal effect to end his service on her. His service under the articles was never legally terminated. The statutes provide a method for discharging an insubordinate or disabled seaman (U. S. Comp. Stats. 1918, § 8382), and it was not followed. The action of the captain was a violation of the articles, and Latty is entitled to compensation for the remainder of the term for which he shipped. If the parties cannot agree upon the amount, it must be stated by an assessor.

[7] As to Benjamin: Benjamin is more at fault than Latty was, because he interfered between the captain and Latty, when the captain was attempting to put irons on Latty. Benjamin's rights were not being infringed; nothing was being done to him; nor was anything being attempted with Latty which was so inhuman as to justify interference by outsiders in his behalf. When the local police came on board, Benjamin again interfered, and threatened them with violent resistance if they attempted to arrest Latty—a decidedly serious offense. He seems to have been defiant to the last. I cannot say that, in thinking

it unsafe to set him at liberty among the crew, or to imprison him and. his two associates on the vessel, the captain was wrong. He was discharged by mutual agreement before the American consul at Cardiff. He has only himself to blame for the trouble which he got into.

As to Vincent: On the evidence, as it stands, Vincent appears to have taken a very minor part in the fracas. He stood by, ready to assist Latty and Benjamin, if an actual fight developed. The captain evidently·considered him dangerous, and the fact that Vincent refused to apologize and go to work until the ship got to Avonmouth strongly corroborates the captain's views. What has been said with reference to· Benjamin applies also to Vincent. There was not the least occasion for him to interfere in any way. Having done so, he must stand the consequences.

Decrees may be entered dismissing the libel as to Benjamin and Vincent, and referring the case to an assessor to state Latty's damages.