JOHN HELLEVIK and ALBERT EPSTEIN, Respondents, *v.* AMERICAN SUGAR TRANSIT CORPORATION, Appellant. (Action No. 1.)

FRED J. ZIMMERMAN, Respondent, *v.* AMERICAN SUGAR TRANSIT CORPORATION, Appellant. (Action No. 2.)

(Consolidated Appeals.)

First Department, April 10, 1941.

*Chester S. Massett* of counsel [*H. Beach Carpenter*, attorney], for the appellant.

*Louis H. Rubinstein* of counsel [*William L. Standard*, attorney], for the respondents.

DORE, J. Defendant steamship company, owner of a steam tanker, appeals by permission of this court from a determination of the Appellate Term affirming two final judgments of the Municipal Court in favor of plaintiffs, three seamen on defendant's ship. Plaintiffs claimed wrongful discharge. The defense was that the discharge, effected by mutual release, was in accordance with the contract or the shipping articles. The Zimmerman case was tried first before a Municipal Court justice without a jury and resulted in judgment in Zimmerman's favor for $64.50. The Hellevik-Epstein case was tried later before another Municipal Court justice without a jury and resulted in judgment in plaintiffs' favor for $150.24. The Appellate Term on a consolidated appeal unanimously affirmed, without opinion.

On February 6, 1939, in the Port of New York before a Federal Commissioner of Shipping, in accordance with the Federal statutes (U. S. Code, tit. 46, §§ 563 and 713), the three plaintiffs, all experienced seamen, with the other members of a crew of thirty-one, signed shipping articles to become seamen on defendant's tanker steamship *Dixiano*. The shipping articles so signed read in part as follows: " It is agreed between the Master and seamen, or mariners, of the S.S. ' Dixiano,' of which C. M. Thorgerson is the present Master, or whoever shall go for Master, now bound from the Port of New York to the Port of Terrafa, Cuba, and such other ports and places in any part of the world as the Master may direct, and back to a final port of discharge in the United States, for a term of time not exceeding Three (3) calendar months."

Pursuant to the shipping articles, plaintiffs' wages were eighty-five dollars a month with maintenance. Standard Brands had chartered the vessel for a voyage to Cuba, there to load with a cargo of molasses and thence to return to some port in the United States for final discharge of cargo. Standard Brands had several depots on the Atlantic coast and Gulf ports, including among others the Port of New Orleans. The charter was for no set period of time but was only a voyage charter. In the shipping articles one plaintiff gave his home address as Norway, another as Michigan and the other as Philadelphia.

The steamship *Dixiano* left New York on or about February 7, 1939, proceeded to the designated Cuban port in ballast and there loaded with a cargo of molasses; thence proceeded to New

Orleans, La., and there made final discharge of the cargo on February 22, 1939. On that date the entire crew of thirty-one men were paid off in the presence of a Deputy Federal Shipping Commissioner in New Orleans and each of the crew, including plaintiffs, signed the Federal form, dated that day, called " Particulars of Discharge " and the form of " Release " prescribed by the Federal statutes (U. S. Code, tit. 46, § 644). Section 644 (R. S. § 4552), so far as relevant, provides that upon the completion before a Shipping Commissioner of any discharge, the master and each seaman in the presence of the Shipping Commissioner shall sign a mutual release of all claims for wages in respect of the past voyage or engagement, and that such release " shall operate as a mutual discharge and settlement of all demands for wages between the parties thereto, on account of wages, in respect of the past voyage or engagement." The release so signed reads as follows: " We, the undersigned seamen, do hereby each one for himself by our signatures herewith given in consideration of settlements made before the shipping commissioner release the Master and owner from all claims for wages in respect to this voyage or engagement, and I, the Master, do also release each of the undersigned seamen in consideration of this release signed by them."

At such termination of the voyage, upon receiving their pay and signing the articles of discharge, eight of the crew, as was their right, permanently left the ship. The vessel at the time had no further charter. The rest of the crew, including plaintiffs, chose to stay on the vessel and the captain kept them on under an oral arrangement for an agreed weekly wage which was paid them for the period from February 22, 1939, to March 4, 1939. However, no further or new shipping articles were signed. On March 4, 1939, the captain received notice from the vessel owners that there was no present charter or business for the vessel and on instructions from New York he reduced his crew to ten, necessary for maintenance of the vessel in port. Plaintiffs were not among those kept on the ship.

When paid their weekly wage on March 4, 1939, one of the plaintiffs, acting as spokesman for the other two, asked for transportation back to New York, which was refused. Plaintiffs returned to New York by bus or train and later instituted these actions. Plaintiffs Hellevik and Epstein claim that prior to signing the shipping articles in New York, the captain made oral representations that the seamen would be brought back on the vessel to Philadelphia. All three plaintiffs claim that, irrespective of any oral representations, there was a general custom among mariners and seamen on coastwise freight voyages that the crew should be returned to the

port of shipment; that defendant breached the employment contract by improperly and illegally discharging them in New Orleans; and they demanded wages for the time it would have taken to bring the vessel from New Orleans to New York plus maintenance and transportation. Plaintiffs also contend that the release they signed is not binding because of the following provision of the Federal statutes: " That notwithstanding any release signed by any seaman under section 644 any Court having jurisdiction may upon good cause shown set aside such release and take such action as justice shall require." (U. S. Code, tit. 46, § 597.)

The rights and obligations of the captain, owner, vessel and seamen in regard to wages, maintenance, etc., are prescribed by Federal statutes (U. S. Code, tit. 46, chap. 18, Merchant Seamen, §§ 541–713). With regard to the engagement, payment and discharge of seamen, Congress has also prescribed the forms and provided for supervision by Federal Commissioners of Shipping in ports of entry in the United States. The shipping articles signed by plaintiffs are in the precise form prescribed by Congress and were signed under the supervision of the Federal Commissioner of Shipping at New York. Shipping Commissioners appointed by the Secretary of Commerce for ports of entry (U. S. Code, tit. 46, § 541) are required to take a prescribed oath of office and give a bond to the United States of not less than $5,000 (U. S. Code, tit. 46, § 542). Their duty is to superintend the engagement and discharge of seamen " in manner prescribed by law "(U. S. Code, tit. 46, § 545), and they may ship crews for any vessel engaged in the coastwise trade or the trade between the United States and the West Indies at the request of the master or owner of such vessel (U. S. Code, tit. 46, § 563). The Commissioner testified that when plaintiffs signed the articles, he informed them, in conformity with the Federal statutes, with respect to the description of the voyage. There is no proof that plaintiffs signed the articles because of oppression or duress. The shipping articles expressly provide that the termination of the voyage was to be a " final port of discharge in the United States." They do not provide that such final port shall be the port of shipment, that is, the Port of New York, where the voyage started, or the Port of Philadelphia as claimed by plaintiffs.

A voyage is ended and wages are due when the vessel is moored and the cargo discharged at her final port of destination. (*The Eagle*, [D. C. N. Y.] Fed. Cas. 4233; *The Annie M. Smull*, [Ore.] Fed. Cas. No. 423.) When the vessel was moored at New Orleans on February 22, 1939, the cargo discharged and the crew of thirty-one men, including plaintiffs, paid off in the presence of and under the supervision of the Federal Shipping Commissioner, no protest

or complaint was made by any of the thirty-one members of the crew. Each one, including plaintiffs, accepted his wages and signed the " Particulars of Discharge " and the " Release " provided for in the Federal statutes. From that moment their engagement under the shipping articles was at an end and they were free to secure another berth on a different vessel or to do any other business. The record establishes that a number of the crew did at that time leave the vessel without protest, as was their right.

Under the terms of the shipping articles and on the facts disclosed there was no wrongful or improper discharge of any member of the crew. The nature of the voyage, the express provisions of the signed articles, and all the relevant facts and circumstances disclosed, negative plaintiffs' contention that the contract was that they would be returned to the Port of Philadelphia. Captain Thorgerson was a witness at both trials and emphatically denied ever making any such oral statement to any of plaintiffs. He testified that while in New York where the voyage began, he had no knowledge of the final port of discharge. The Federal Deputy Commissioner of Shipping also testified that when the shipping articles were signed in New York on February 6 and 7, 1939, no one asked him whether the vessel would return to New York, and that if any one had, he would have replied he did not know. The nature of the charter party and the terms of the signed contract corroborate this testimony. The ship was not a freighter with regular ports of call, nor a passenger vessel or liner with a pre-arranged schedule of ports of departure, ports of call and return. It was a coastwise cargo steamer under a voyage charter. Due to the nature of the charter and the exigencies of trade, neither the captain nor the owners could know in advance before the ship sailed from New York what the final port of discharge would be except that it would be a port in the United States. Plaintiffs' contention to the contrary is not only against the express language of their signed agreement but against the weight of the credible evidence and the probabilities inherent in the state of facts established in this record. In Zimmerman's case, his testimony is conclusive as he admitted he read the shipping articles before he signed them.

Shipping articles providing for " a final port of discharge in the United States " have been held to comply with the Federal statutes requiring that the articles state the nature and, so far as practicable, the duration of the intended voyage and the port or country in which the voyage is to terminate. (*The Mermaid*, 115 Fed. 13 [C. C. A., Ninth Circuit, 1902]; *The Golden Kauri*, 28 F. Supp. 288 [D. C. E. D. La. July, 1939]; *Johnson* v. *Standard Oil Co. of New*

*Jersey*, 33 F. Supp. 982 [D. C. D. Md. July, 1940]; U. S. Code, tit. 46, § 564 [R. S. § 4511].)

Under the facts disclosed variation of the agreed terms of the shipping articles signed by the seamen before beginning the voyage, in the presence of the Federal Shipping Commissioner in the Port of New York, may not be permitted.

Plaintiffs' claim of a general custom that seamen shipping on coastwise steamers which have no definite home port should be brought back on the vessel to the port of shipment or embarkation is in our opinion not supported by satisfactory evidence in this record. The testimony as to such custom was insufficient in form and inconclusive in substance. It is also categorically denied by the captain who had thirty-three years' experience and by the Deputy Federal Commissioner of Shipping at New York. The impractical and disastrous results of any such asserted general custom should be obvious. Should a coastwise cargo vessel stop at intermediate ports and for sickness or other cause discharge some members of the crew and replace them by new members who shipped from such ports, then under the asserted general custom the vessel would be obliged to carry the various crew members back to each port whence they originally shipped though the vessel never secured any future business during the stated term of the voyage at such ports or, in the alternative, the ship owner would be compelled to pay for transportation, maintenance and wages of each of the seamen to each such port. Plaintiffs fail to cite a single case specifically holding that seamen signing shipping articles for a voyage to a Cuban (West Indian) port on a coastwise cargo vessel " and back to a final port of discharge in the United States " have the legal right to be returned to or near the port of shipment.

Defendant also contends that the " Release " signed by plaintiffs at New Orleans on February 22, 1939, is effective and binding. The statute as amended in 1915 (U. S. Code, tit. 46, § 597, *supra*) provides that such a release is binding and effective except " upon good cause shown " to set aside such release. In *Rosenberg* v. *Doe* (146 Mass. 191; 15 N. E. 510) Mr. Justice HOLMES, then a justice of the Supreme Court of Massachusetts, referring to a release in a seamen's case, said: " The statute means to make the release conclusive, if it is executed and attested as required without fraud or coercion." However, in *Cox* v. *Lykes Brothers* (237 N. Y. 376, 381), CARDOZO, J., speaking of the effect of the amendment of section 4530 of the Revised Statutes (U. S. Code, tit. 46, § 597), providing that a seaman's release may be set aside for good cause shown, said: " The amendment means that if unfair advantage is taken of their neces-

sities or ignorance, they are no longer to be concluded by releases which throw their rights away. The courts under the present act may relieve from oppression, though it fall short of fraud or duress in the rigor of its constraint, if thereby justice will be done." But in that case wages were withheld without color of excuse when a seaman had reached the end of his resources, and he was told that no money would be paid without the signing of the paper. It was held the release did not constitute a bar.

The statute, however, does not totally abrogate the efficacy of a release signed by seamen and make their signature a wholly futile formality. Here, none of the crew of thirty-one seamen, including plaintiffs, made any claims or complaints when paid off on February 22, 1939, when the release was signed. It was only later on March 4, 1939, when the captain refused plaintiffs' demand for transportation and wages to New York, that three of a crew of thirty-one, evidently as an afterthought, made claim that the release they had signed was ineffective. In this record plaintiffs have failed to establish " good cause " for which the release should be set aside. (See *The San Lucas*, 1 F. Supp. 883 [1932]; *Landro v. Pacific Atlantic S. S. Co.*, 30 id. 538; *The Aberdeen*, 7 id. 856; *The Dolphin*, 34 id. 248 [1940].)

There is no real inconsistency in the Deputy Shipping Commissioner's testimony on the second trial when read with his testimony on the first trial. While he stated on the first trial, " I didn't read the articles," he also immediately added, " I told them what the voyage was, that's all." That necessarily included the information that the ship was bound for the Port of Terrafa in Cuba and back to a port of final discharge in the United States for a term not exceeding three calendar months. It was obviously unnecessary for him to read all details in the articles such as the amount of coffee, tea, molasses, sugar, etc., that the shipping articles expressly provide for each day in the week, the percentages thereof and the possible substitutes. The Commissioner categorically testified on both trials that he read to plaintiffs and the rest of the crew the description of the voyage. This was corroborated by the captain. We think plaintiffs did know the description of the voyage set forth in the articles. No claim was made that they could not read. Zimmerman said he had read the articles before he signed them. Epstein testified that he had seen them on the forecastle, but that he did not go over all the fine print. He did not have to read any fine print to read the description of the voyage. These provisions are not in fine print but in large type, well spaced, clearly and easily legible, and phrased in simple, understandable language.

The engagement and the discharge pursuant to its terms were sanctioned and approved as provided by law by two Federal Deputy Shipping Commissioners, one in the Port of New York and one in the Port of New Orleans, each professionally familiar with seamen's contracts. To allow recovery on the facts disclosed in these records is to make futile the statutory provisions for seamen's agreements in writing and their supervision by governmental commissioners.

In *The Lakme* (93 Fed. 230 [D. C. D. Wash. N. D.]) the court said: " It is necessary for the protection of seamen that ship owners and masters be held to strict performance of their part of shipping contracts, and justice requires that the same rule be applied in determining the rights of the parties, whether it be invoked by the seamen or by their adversaries. *The Triton*, Fed. Cas. No. 14,181; *The Warrington*, Fed. Cas. No. 17,208."

On this record and under the authorities, plaintiffs' discharge was in accordance with their written and binding contract and the mutual release signed without force or fraud, duress or compulsion.

The determination of the Appellate Term and the judgments of the Municipal Court should be reversed and the complaints dismissed on the merits, with costs to the defendant in all courts.

MARTIN, P. J., TOWNLEY, COHN and CALLAHAN, JJ., concur.

Determination of the Appellate Term and judgments of the Municipal Court unanimously reversed and the complaints dismissed on the merits, with costs to the defendant in all courts.