INGWALD HANSEN, Plaintiff, *v.* OIL TRANSFER CORPORATION, Defendant.

Municipal Court of the City of New York, Borough of Manhattan, January 12, 1949.

248

*Harold Guttman* and *Harold P. Clune* for plaintiff.

*Gerald J. McKernan* and *Harold C. Hart* for defendant.

WATSON, J. The defendant, a steamship company, entered into an arrangement with the plaintiff at New York, pursuant to which the plaintiff was sent to Aruba, a West Indies port, at defendant's expense, to join the defendant's vessel, as chief mate. While still in New York, the defendant prepared a letter, which, while on one hand, seems to confirm the plaintiff's status as an employee, nevertheless contains an express provision to the effect that the plaintiff was not to be deemed an employee until he signed the shipping articles. The plaintiff indicated his acceptance of the provisions of this letter, by signing a statement to that effect, at the bottom thereof.

When the plaintiff arrived aboard the ship, ready to sign the articles, a clash of personalities occurred between plaintiff and the master, as a result of which the latter came to the conclusion that the plaintiff had not shown proper respect to his authority, and he, therefore, refused to sign the plaintiff on.

The defendant then repatriated the plaintiff to Miami, Florida, but the plaintiff was required to expend his own money for subsistence and return transportation expenses back to New York.

On plaintiff's return to New York, he filed three suits in this court against the defendant, each in the amount of $1,000. These suits were consolidated by order of the court, only for trial purposes. The first is to recover damages for breach of contract of employment, for wages from April 20, 1948, to June 20, 1948, at $400 per month, subsistence of $200 for said period and for transportation expenses incurred in the amount of $140.74, in returning from Miami, Florida, to New York. The second is to recover wages from June 20, 1948, to August 20, 1948, at $400 per month and subsistence of $200 for two months. The third is to recover wages from August 20, 1948, to October 20, 1948, at $400 per month and subsistence of $200 for that period. The aggregate amount of the items of the first cause of action is in excess of the jurisdictional amount of this court. Plaintiff has waived the difference.

Defendant claims that it owed the plaintiff no obligation by reason of the letter above referred to, until such time as the

plaintiff would be signed on the shipping articles. I think otherwise. The fair intendment of the arrangement, was that plaintiff was being engaged in New York to join the ship in the West Indies, but that the defendant did not desire to be responsible for wages or for anything which might happen to the plaintiff while he was in transit from New York to the port of Aruba in the West Indies. Accordingly, it inserted the provision that he was not to be deemed an employee, until such time as he would sign the shipping articles.

The defendant had satisfied itself concerning the plaintiff's qualifications for the position of chief mate before giving him the letter of introduction and before incurring expenses to send him from New York to the West Indies to join the ship, and that the parties intended that the plaintiff was to be signed on as chief mate, on his arrival aboard the ship. It is not reasonable to believe that the plaintiff intended to make a trip from New York to the West Indies, solely for the purpose of having the master then arbitrarily decide whether he was acceptable for employment, taking the chance that in the event the master would not find him acceptable, he might be left stranded in a port far from home.

In short, I think a fair construction of the agreement between the parties was that the plaintiff was to be given employment upon boarding the ship, unless the defendant could show some justifiable reason for refusing to sign him on, and that plaintiff agreed to accept such employment. Defendant recognizes the fact that there was a binding contract between the parties because its counterclaim of $1,000 against the plaintiff is based on the alleged failure and refusal of the plaintiff '' to carry out all of the terms and conditions of the aforementioned contract,'' by refusing or failing to sign the shipping articles.

In coming to the conclusion that the parties here had a valid agreement, I have considered the rule that an agreement should be strictly construed as against the ship operator which prepared it, but liberally construed insofar as plaintiff, a mariner, is concerned. (*The Catalonia,* 236 F. 554 [D. Ct. Va., 1916].)

I have also taken into consideration the language of the court in *The John L. Dimmick* (13 Fed. Cas. No. 7,355, p. 690) where the court awarded seamen reimbursement for subsistence while in port, where the articles made no mention of such a right, holding that the duty to provide subsistence was an implied term of the hiring. The court stated at page 692: '' What difficulties might present themselves in the refined and subtle technicalities of the common law it is unnecessary here to

inquire. The wrong is not beyond the remedies of a court, professing, like the admiralty, to decide ex aequo et bono, on enlarged principles of natural equity and the universal justice.''

See, also, *Hume* v. *Moore-McCormack Lines* (121 F. 2d 336 [C. C. A. 2d, 1941]) where Circuit Judge FRANK stated, at page 342: '' How was it that, during the 19th century, admiralty made a special rule for sailors? An explanation, other than the conventional, at once comes to mind: Many of the obligations owing by shipowners to seamen are not imposed by contract but are imposed by law, they are ' relational ' and not contractual * * *.''

The question here, therefore, is whether the master was justified in refusing plaintiff employment when he arrived in the West Indies. The burden of proving this defense, of course, was on the defendant. While no identical cases have been found, the principle to be applied may be derived from analagous decisions.

In *Rogers* v. *Pacific Atlantic S. S. Co.* (170 F. 2d 30 [C. C. A. 9th, 1948]), the court held that a ship's engineer, who is a licensed officer, would not be justified in leaving a ship in a foreign port, even though the captain's disposition was found to be such that it would be bound to create disharmony aboard the vessel.

Conversely, it had likewise been held that a mariner may not be justifiably discharged in a foreign port for an isolated act of misconduct, and that in any event, such a discharge is only justified in an extreme case. (*McAvey* v. *Emergency Fleet Corp.*, 15 F. 2d 405 [D. Ct. Mass., 1926]; *The Golden Sun*, 30 F. Supp. 354 [D. C. Cal., 1939]; *Latty* v. *Emergency Fleet Corp.*, 279 F. 752 [D. Ct. Mass., 1922]; *Collazzo* v. *Wessel, Duval & Co.*, N. Y. L. J. Jan. 14, 1948, p. 163, col. 7, KAHN, J.; *Nieto* v. *Clark*, 18 Fed. Cas. 10,262, p. 236; *Magee* v. *The Moss*, 16 Fed. Cas. 8,944, p. 384; *Wilson* v. *The Mary*, 30 Fed. Cas. 17,823, p. 146.)

In *The Superior* (22 F. 927 [D. Ct. N. Y.]) a woman was employed as a cook on a ship, under articles which provided that she was engaged for a round trip '' if not sooner discharged.'' She testified that she was not aware of the latter clause. She was discharged at an intermediate domestic port, for having an ungovernable temper, and using disrespectful, profane and obscene language to the master. Judge Cox stated at page 928: '' The weight of evidence has convinced me that her temper was ungovernable, her language obscene, profane, and direspectful, and her conduct, upon at least two occasions, reprehensible

in the extreme. I fail, however, to find anything in the testimony which justified the master in turning her away penniless, friendless, and alone — a stranger in a foreign port. The books have been searched with some anxiety to find an authority sustaining the respondent's view, but without success. Discharges, pending the voyage, have been upheld where there has been ' mutinous and rebellious conduct, persevered in; gross dishonesty or embezzlement, or theft, or habitual drunkenness; or where the seaman is habitually a stirrer-up of quarrels, to the destruction of the order of the vessel and the discipline of the crew.' ''

If we are to draw an analogy from the cases cited above, it would appear that the defendant has failed to meet its burden of proving that there existed substantial reasons for refusing the plaintiff the right to enter upon his employment, after inducing him to go to join the ship in a foreign port.

Defendant places great reliance on the fact that formal shipping articles were never signed by plaintiff, hence there was no valid contract of employment, since defendant's letter of introduction of plaintiff to the ship's captain expressly provided that '' It is understood and agreed that he [plaintiff] is not an employee of this company until he signs articles,'' to which condition plaintiff indicated his acceptance by signing a statement at the bottom of the letter in the following language: '' The above terms of hire meet with my approval.'' This letter is more than an introduction. It is helpful in showing the entire picture and reflects part of the arrangement entered into between the parties.

The signing of shipping articles, while required by Federal statute for the protection of seamen before the ship '' actually proceeds to sea '' (U. S. Code, tit. 46, § 567), does not, in many instances, determine when the employment relationship commences or when it terminates (*Southern S. S. Co.* v. *National Labor Relations Bd.*, 316 U. S. 31). Moreover, plaintiff's rights were not based on the shipping articles, but on the agreement entered into with the defendant in New York. A mariner may have rights imposed by the general maritime law, even in instances where shipping articles have not been signed. (*Hunt* v. *United States*, 17 F. Supp. 578, affd. 91 F. 2d 1014 [C. C. A. 2d, 1937]; *Sullivan* v. *United States*, 1947 A. M. C. 426 [D. Ct. N. Y.]; *Bailey* v. *City of New York*, 55 F. Supp. 699 [D. Ct. N. Y., 1944]; *The Michael Tracy*, 295 F. 680 [C. C. A. 4th, 1924]; *The Topsy*, 44 F. 631; *Jameson* v. *The Regulus*, 13 Fed. Cas. 7,198, p. 336; *The Falco*, 20 F. 2d 362 [C. C. A. 2d, 1927]. See, also, *Warren* v. *United States*, 76 F. Supp. 735 [D. Ct. N. Y., 1948].)

Defendant owed the plaintiff certain obligations in inducing him to go from New York to Aruba, a foreign port, for a job, even though shipping articles were not signed. The absence of plaintiff's signature on the articles should not delimit his rights under the contract where he was ready to sign on, and the defendant's master, by adopting an unnecessarily strict attitude as to disciplinary behavior, prevented him from doing so. If the alleged disrespectful attitude of the plaintiff had occurred five minutes after he had signed the shipping articles, in the very same port, then the master, clearly would not have been privileged to terminate his services under the facts disclosed in this case (*The Superior, supra*). Why then should the plaintiff's rights be different if the incident occurred shortly before the articles were to be signed?

Plaintiff made persistent efforts to sign the articles and to begin performance of his duties, to no avail. He was checkmated in every attempt to accomplish his purpose. His willingness to become part of the ship's complement according to his employment contract is further evidenced by the fact that while he was awaiting the captain's decision to allow him to sign the articles, plaintiff voluntarily assisted in the removal of perishable stores from the ship's deck, on an extremely hot day.

On his first appearance in the captain's cabin to present his credentials he was ordered out of it. Thereafter, on the same day, he sought the aid of defendant's marine superintendent at Aruba to intercede by persuading the captain to allow him to sign on. After a conference in the captain's quarters in which plaintiff, the captain and marine superintendent participated, plaintiff was told '' the captain has decided he didn't want me on the ship.'' It is plaintiff's testimony also, that on presentation of defendant's letter of introduction on his second visit to the captain's cabin, the captain, after reading it, said: '' I told those people not to send me any Aryans and foreign born mates any more '' and stated further that '' he was going to settle this thing, it's either him or me to get off the ship.''

Although those statements were denied categorically by the captain, his own testimony on cross-examination lends corroboration to plaintiff's testimony in that respect, as shown by the following questions and answers: '' Q. Did you tell anyone that you would refuse to continue as master of the ship if Hanson signed as first mate? A. I did. Q. Did you say it was either

you or Hanson? A. That's correct. Q. Will you state on the record your reasons for your decision that you would not remain as captain of the vessel if the plaintiff was signed on as ˙ chief officer, the reasons for your statement before? A. Because of the conduct of the prospective chief officer in my cabin at the time of the introduction.'' Plaintiff also stated to defendant's marine superintendent he did not want to go back to New York, but wanted to sign the ship's articles, and was informed that it was up to the master. Thereafter, he sought the aid of the American Consul at that port and after an arranged conference at the Consul's office at which the captain failed to appear, the marine superintendent, after a conversation had with the Consul, not in plaintiff's presence, told him the captain has decided to send him back home. Thus, it appears that plaintiff was not given the opportunity of beginning his employment, even though he wanted to, by reason of the obdurate attitude of the captain in preventing him from signing on.

The plaintiff's right to be reimbursed for his return transportation and subsistence expenses, and for his loss of wages, stands on a somewhat similar footing. The defendant apparently realized that it owed plaintiff some duty of repatriation, upon refusing to sign him on, for it provided the plaintiff with return transportation to Miami, Florida. In this regard, the defendant claims that it was justified in discharging the plaintiff at any United States port, and was under no obligation to return plaintiff to New York. It is my opinion that the law is otherwise.

A steamship company is entitled to discharge a seaman at any United States port, if the man has been signed on under shipping articles which give it such a right. (See *Hellevik* v. *American Sugar Tr. Corp.*, 261 App. Div. 591 [1st Dept.].)

However, as the court stated in *Worth* v. *Steam-Boat Lioness No. 2* (3 F. 922, 923, 924): '' When there are no shipping articles, and no prescribed voyage stated, the implied contract or legal assumption is that he is to be returned to the port of shipment. Were this otherwise, most disastrous consequences might often result. * * * It must, however, be always considered that mariners stand in the relation of wards of court, and that, inasmuch as it is in the power of the master and owners to make their contracts definite by shipping articles or otherwise, the legal presumption arises, if they do not specify in their agreements to the contrary.''

Thus, it has been similarly held that where a seaman falls ill at an intermediate port, the general maritime law will impose on the ship operator the duty of providing return transportation to the port of shipment. (*The Hawaiian,* 33 F. Supp. 985 [D. Ct. Md., 1940]; *Miller* v. *United States,* 51 F. Supp. 924 [D. Ct. N. Y., 1943].)

A somewhat analogous case was *Boultin* v. *Moore* (14 F. 922 [C. C. Ill.]), in which seamen were employed for a voyage aboard a vessel, but the voyage was broken up by inclement weather, with the result that the seamen incurred expenses in returning to the port of shipment. The court stated as follows at pages 925–928:

" In the case of *The Hudson,* 8 FED. REP. 167, where the libelants, without any written articles, shipped on board of a packet running between Pittsburgh and Cincinnati, on the Ohio River, and on the arrival of the packet at Pittsburgh, the river being frozen over and navigation by reason of ice having been suspended for eight days, were discharged, the court held that they were entitled to their wages up to the time of their return to the place of shipment, as well as their expenses during their return. In that case, I think it may be inferred, perhaps, that the libelants were discharged without sufficient cause, and in that respect it was different from the case under consideration. * * * In examining the cases cited, and others which might be named, one cannot avoid the conclusion that the courts of admiralty have adopted rules much more liberal to seamen than are applied to other persons who ordinarily make contracts with each other. They have appeared studious to guard at every possible point what may be considered as the equities of the sailor. They do not apply the same strict rules of construction to the contracts which he makes as in the contracts of other persons. If there is anything in his contract which the court thinks hard or unfair to the seaman, the court requires clear evidence that he made the contract with a full knowledge of what it contains, and his assent to such clauses therein written, and in the case of any unforeseen event occurring, or one not provided for or anticipated, perhaps it is not too strong an expression to say that the courts construe the contract upon the assumption of what the sailor would have claimed or inserted if the event had been foreseen or anticipated. Their contracts are regarded by the courts of admiralty under the influence of feeling quite as much as of logic. As ' wards ' of the court, they are treated with the tenderness of a guar-

dian. * * * As has already been intimated, it must be presumed to have been within the knowledge of both parties that there was a chance for the voyage to be arrested by the approach of winter, and by obstructions caused by ice. * * * Under ordinary circumstances, we think, it could be truly said that the event having happened which both parties had the right and whose duty it was to anticipate, that each was left entirely free; that the service having terminated, payment for the service actually performed would release the vessel-owner from all further obligations. On principle, it seems that no other rule could be established; but, as has already been said, this is not a case between ordinary persons, but a case between seamen and the owners of the vessel where circumstances have occurred, which have not been provided for in the contract. As was intimated by the district court in its opinion, we can imagine that cases might arise where it would become a question, even conceding that the expenses of the seamen were to be paid, to what point they might go,— whether to the point of departure or to the port where the voyage was to terminate; in this case the first being at Chicago, and the second at Erie. No doubt difficult questions might arise, in similar cases — depending upon the place between the two ports where the voyage was terminated for the season; but those would have to be decided under the special circumstances of each case, and need not now be anticipated here. The libelants desired to return to the place of departure, and it was not proposed to send them to the port of destination; in fact, the expense and difficulty of reaching that port were much greater.

" In looking at the general current of the authorities upon the questions involved here, it seems as though the court could not escape the conclusion that, in favor of the seamen, their expenses should be allowed in this case, because they are seamen, and because a court of admiralty is bound specially to regard their interest. * * * the same rule which would award the libelants their expenses from Escanaba to Chicago, would also, although the claim was not here made, give them their wages during the short time occupied in the journey between the two places."

In the light of the cited authorities, it is my opinion that, in all fairness, there should be held to have been an implied understanding between the parties, to the effect that, in the absence of serious misconduct on the part of the plaintiff, or incompetence (neither of which exist in this, case), the master

of the ship had not the right to refuse to sign the plaintiff on.

In a situation such as this, a seaman is entitled to reimbursement of his transportation expenses back to the port at which he was first employed and any subsistence or lodging expenses while en route, together with loss of wages, limited by the date he was able to obtain other employment.

Plaintiff claims he was employed for one year from April 20, 1948. The defendant says the arrangement was for a period measured by the voyage. Although the shipping articles of one year expired on July 24, 1948, the vessel was still on the original voyage on the date of the trial and has not yet returned to a port of final discharge in the United States. In such cases, the voyage continues till the ship's return, assuming that defendant has not been wrongfully prolonging the voyage (*Hamilton* v. *United States,* 268 F. 15, certiorari denied 254 U. S. 645). Accepting even defendant's version of the arrangement in this regard as the correct one, the plaintiff would be entitled to recover for loss of wages and subsistence for the period embraced in these suits.

There is evidence that beginning May 26, 1948, and during the period of plaintiff's unemployment, he received unemployment insurance benefits for twenty-six weeks at $26 per week, amounting to $676. It is intimated that this amount should be applied in reduction of an award to plaintiff, if any. In *Moyle* v. *National Petroleum Transp. Corp.* (150 F. 2d 840, 842 [C. C. A. 2d, 1945]) the court said that benefits received by a seaman from the department of welfare may not be deducted from an award for maintenance and care. A parity of reasoning would seem to lead to the conclusion that unemployment insurance benefits are likewise not deductible from an award which a seaman receives from a steamship company which breached the contract of employment with him. Any other ruling would mean that the steamship company is the recipient of relief or unemployment insurance payments rather than the employee, who is entitled by law to these benefits.

Plaintiff is entitled to judgment in the sum of $1,000 on each of the three causes of action, with interest, and to a dismissal of defendant's counterclaim for failure of proof, on plaintiff's motion therefor, made at the close of the whole evidence.

Judgments should be entered accordingly.